**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

**LAMAR ALLAN JOHNSON**,

v.

            *Plaintiff*,                Case No._____

                                     **JURY TRIAL DEMANDED**

**THE CITY OF ST. LOUIS, MISSOURI,**

and

Officers **JOSEPH NICKERSON**, **CLYDE BAILEY, RONALD JACKSON, GARY STITTUM, JEFFREY CRAWFORD, RONALD HENDERSON, ROBERT OLDANI,** and **JOSEPH BURGOON**, in their individual capacities,

and

**VIRGINIA CAMPBELL**, PERSONAL REPRESENTATIVE OF THE ESTATE OF **RALPH CAMPBELL**,

            *Defendants.*

## COMPLAINT

    Plaintiff Lamar Johnson, through his attorneys, the law firms of Neufeld Scheck Brustin Hoffmann & Freudenberger, LLP, and Morgan Pilate, LLC, brings this Complaint arising from his wrongful arrest, detention, prosecution, and convictions for murder and armed criminal action.  Johnson alleges the following:

1

**INTRODUCTION**

1.      Plaintiff Lamar Johnson spent nearly three decades wrongfully imprisoned for the October 30, 1994, murder of his friend, Markus Boyd. Johnson was a young father who was working and attending college when Defendants[1] detained, arrested, and framed him for a murder he did not commit.

2.      After independent investigation into Johnson's case, the St. Louis Circuit Attorney's Office Conviction Integrity Unit ("CIU") issued a scathing report and initiated litigation to free Johnson, finding that Johnson was factually innocent and the convictions against him were based on false evidence.

3.      Markus Boyd was killed by two masked gunmen on a dark porch shortly after 9:00 p.m. on October 30, 1994.  A man, James Gregory (Greg) Elking, was on the porch with Boyd at that time and ultimately became the State's most important witness.

4.      Elking was never able to see or identify the masked gunmen who killed Boyd, but Defendants coerced and manipulated Elking into accepting their manufactured identification of Johnson, the State's only direct evidence at trial.

5.      The killers, Phillip Campbell[2] and James Howard, both credibly confessed—repeatedly—over the course of more than two decades, in personal writings, sworn

---

[1] Throughout the Complaint, "Defendants" or "Individual Defendants" refers to the individual Defendant officers: Joseph Nickerson,  Clyde Bailey, Ronald Jackson, Ralph Campbell, Gary Stittum, Jeffrey Crawford, Ronald Henderson, Robert Oldani, and Joseph Burgoon.

[2] For clarity, true perpetrator Phillip Campbell and Defendant Ralph Campbell (no relation to each other) will be referred to by their first and last names throughout this Complaint.

statements, and under-oath testimony. Their confessions are supported by motive and physical evidence and witnesses at the scene.

6.    For more than two decades Elking admitted what should have been obvious from the start to objective and honest detectives: he was never able to identify the gunmen who concealed their faces, and his identification at trial was false and manufactured.

7.    No physical evidence ever implicated Johnson, and he had a solid, verifiable alibi, an alibi that he gave to Defendants from the first moment he spoke with them about Boyd's murder.

8.    Johnson maintained his innocence from the moment he learned Boyd was shot, to Defendants at his arrest, through trial and sentencing, and for the nearly three decades of wrongful imprisonment.

9.    With no motive or physical evidence tying him to the crime, Johnson was convicted because Defendants manufactured a case against him through the false and fabricated testimony of a lone, unreliable and coerced eyewitness and an unreliable and incentivized jailhouse snitch.

10.    In 2018, the CIU of the St. Louis Circuit Attorney's Office initiated an investigation into Johnson's convictions.

11.    In 2019, the CIU issued a report of its findings. The Circuit Attorney's Office determined Johnson was factually innocent and Defendants had repeatedly violated his constitutional rights. The Circuit Attorney's Office initiated proceedings to overturn Johnson's convictions.

3

12.    After decades of asking Missouri courts to hear his evidence of innocence and constitutional violations, Johnson was finally granted an evidentiary hearing. The Circuit Attorney for the City of St. Louis filed a motion to vacate Johnson's convictions pursuant to Section 574.031, a statute that was passed largely in response to his case.

13.    A Circuit Court for the City of St. Louis held a five-day evidentiary hearing in December 2022, marking the first time Johnson's overwhelming evidence of innocence and official misconduct was heard by any court.

14.    On February 14, 2023, the Honorable David Mason of the Twenty-Second Judicial Circuit declared Johnson factually and actually innocent of Boyd's murder. The underlying criminal case, *State v. Johnson* No. 22941-3706A-01, was vacated the same day. Johnson was unconditionally released from the State's custody on February 14, 2023.

15.    In the final chapter of the injustice that stole over 28 years of Johnson's life, he now sues Defendants for their unconstitutional misconduct that caused his wrongful arrest and convictions which inflicted enormous and irreversible harm.

## JURISDICTION AND VENUE

16.    This action is brought pursuant to 42 U.S.C. § 1983 and state law to remedy the deprivation under the color of law of Johnson's rights guaranteed by the United States Constitution. This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

17.    This Court has supplemental jurisdiction over Johnson's state law claims pursuant to 28 U.S.C. § 1367.

4

18.    Venue is proper in the Eastern District of Missouri pursuant to 28 U.S.C. § 1391(b) and (c) because this is the district where most of Defendants reside and where the events giving rise to the claims herein arose.

## JURY DEMAND

19.    Johnson demands a trial by jury on all issues and claims set forth in this Complaint pursuant to the Seventh Amendment of the U.S. Constitution and Federal Rule of Civil Procedure 38(b).

## PARTIES

### *Plaintiff*

20.    Plaintiff Lamar Johnson was a resident of the State of Missouri at all times relevant to this Complaint. On July 12, 1995, Johnson was wrongfully convicted of the murder of Markus Boyd and armed criminal action. On September 29, 1995, he was sentenced to life without the possibility of parole. Johnson served more than 28 years in the custody of the Missouri Department of Corrections, often in a maximum-security facility. Johnson was unconditionally released from prison on February 14, 2023, after being declared actually innocent and fully exonerated.

### *Defendants*

21.    Defendant **CITY OF ST. LOUIS, MISSOURI** ("St. Louis" or the "City") is a constitutional charter city located in the State of Missouri.  The City operates under the Charter of the City of St. Louis, adopted June 30, 1914, as amended. The City is responsible for and operates the St. Louis Metropolitan Police Department ("SLMPD") and the St. Louis Circuit Attorney's Office. As of at least September 1,

2013, the City accepted and assumed responsibility, ownership, and liability as successor-in-interest for contractual obligations, indebtedness, and other obligations of the St. Louis City Board of Police Commissioners.

22.     Defendant **JOSEPH NICKERSON**, at all times relevant to this Complaint, was an officer of the SLMPD acting under color of law and within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of St. Louis, Missouri, the SLMPD, and the State of Missouri. He is sued in his individual capacity. Nickerson was assigned as a detective with the Homicide Unit at the time of this investigation.

23.     Defendant **CLYDE BAILEY**, at all times relevant to this Complaint, was an officer of the SLMPD acting under color of law and within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of St. Louis, Missouri, the SLMPD, and the State of Missouri. He is sued in his individual capacity. Bailey was assigned as a detective with the Homicide Unit at the time of this investigation.

24.     Defendant **RONALD JACKSON**, at all times relevant to this Complaint, was an officer of the SLMPD acting under color of law and within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of St. Louis, Missouri, the SLMPD, and the State of Missouri. He is sued in his individual capacity. Jackson was assigned as a detective with the Homicide Unit at the time of this investigation.

25.     Upon information and belief, Defendant **VIRGINIA CAMPBELL, PERSONAL REPRESENTATIVE OF THE ESTATE OF RALPH CAMPBELL** administers the estate of Ralph Campbell, who is deceased. At all times relevant to this Complaint, Ralph Campbell was an officer of the SLMPD acting under color of law and within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of St. Louis, Missouri, the SLMPD, and the State of Missouri. Ralph Campbell was assigned as a detective with the Homicide Unit at the time of this investigation, and his estate is sued for actions taken in his individual capacity.[3]

26.     Defendant **GARY STITTUM**, at all times relevant to this Complaint, was an officer of the SLMPD acting under color of law and within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of St. Louis, Missouri, the SLMPD, and the State of Missouri. He is sued in his individual capacity. Stittum was assigned as a detective with the Homicide Unit at the time of this investigation.

27.     Defendant **JEFFREY CRAWFORD**, at all times relevant to this Complaint, was an officer of the SLMPD acting under color of law and within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of St. Louis, Missouri, the SLMPD, and the State of Missouri. He is

---

[3] All allegations and references to Defendant Ralph Campbell throughout this Complaint form the basis for the claims against the Personal Representative of his Estate.

sued in his individual capacity. Crawford was assigned as a detective with the Homicide Unit at the time of this investigation.

28.     Defendant **RONALD HENDERSON**, at all times relevant to this Complaint, was an officer of the SLMPD acting under color of law and within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of St. Louis, Missouri, the SLMPD, and the State of Missouri. He is sued in his individual capacity. Henderson was assigned as a lieutenant with the Homicide Unit at the time of this investigation.

29.     Defendant **ROBERT OLDANI**, at all times relevant to this Complaint, was an officer of the SLMPD acting under color of law and within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of usage of the City of St. Louis, Missouri, the SLMPD, and the State of Missouri. He is sued in his individual capacity. Oldani was assigned as a captain with the Crimes Against Person Division at the time of this investigation.

30.     Defendant **JOSEPH BURGOON**, at all times relevant to this Complaint, was an officer of the SLMPD acting under color of law and within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the usage of the City of St. Louis, Missouri, the SLMPD, and the State of Missouri. He is sued in his individual capacity. Burgoon was assigned as a sergeant at the time of this investigation.

31.     Upon information and belief, all Defendants are insured by one or more policies of liability insurance purchased pursuant to Mo. Rev. Stat. §§ 537.610, 71.185 or other applicable state law with respect to all acts and omissions complained of herein.

## FACTUAL ALLEGATIONS

### *James Howard and Phillip Campbell kill Markus Boyd*

32.     At approximately 9:00 pm on October 30, 1994, James Howard and Phillip Campbell shot and killed Markus Boyd on the front porch of Boyd's Dutchtown St. Louis home during an unsuccessful attempted robbery.

33.     In addition to his job at a printing company, victim Markus Boyd sold small amounts of crack cocaine.

34.     Howard's and Phillip Campbell's associate, Sirone "Puffy" Spates, believed Boyd had undercompensated him in a prior drug deal; Howard and Phillip Campbell went to Boyd's house on Spates's behalf to recover what Spates allegedly was owed from Boyd and to teach Boyd a lesson.

35.     Howard and Phillip Campbell approached Boyd's house from the gangway that ran alongside it to an alley, wearing dark clothing and black ninja, ski-like masks which concealed every physical feature except the eyes:



36.     Boyd was sitting on his unlit porch speaking to Greg Elking, a co-worker of his from the printing company who was also a drug customer, when Howard and Phillip Campbell ran up with guns drawn.

37.     Phillip Campbell held a gun on Elking and pulled him to his feet and away from the porch, while Howard grabbed Boyd and tried to bring him upstairs to rob him. When Boyd fought back, Howard and Phillip Campbell shot Boyd several times, killing him. The entire encounter was over in seconds.

38.     The nighttime darkness, the gunmen's ski masks, the brevity of the encounter and his focus on the gun pointed at him, Elking was never able to observe the gunmen well enough to identify them. Elking, who was white, could make out the skin color of only one of the men, which he later described as almost as black as the hood covering his face.

39.     Boyd's girlfriend Leslie Williams, who was upstairs with their infant daughter, ran downstairs to see the masked men shooting at Boyd.

40.     Despite being only a few feet away, Leslie[4] could not identify either gunman. Importantly, Leslie—who knew Lamar Johnson well—did not recognize either gunman as anyone she knew. Leslie ran back upstairs and at 9:07 p.m. called 9-1-1.

41.     After the shots, Howard and Phillip Campbell fled the porch on foot, leaving the way they came: through the gangway to the alley and back to Howard's house, just down the alley on the same block.

---

[4] There are several witnesses with the surname Williams. These witnesses will be referred to by their first names for clarity.

42.     After the masked gunmen fled the porch, leaving Elking unharmed, Elking ran

to his home a few blocks away, terrified and in shock.

### *Lamar Johnson is innocent of Markus Boyd's murder*

43.     Lamar Johnson is innocent. He was not involved in Boyd's murder:  he was not

present, nor did he participate in any way.

44.     At the time of the shooting, Johnson was at a friend's house in the Tiffany

neighborhood with his then-girlfriend, Erika Barrow. The house—located at 39th

Street and Lafayette Avenue—was three miles away from the scene of the shooting.

45.     The true perpetrators, James Howard and Phillip Campbell, have repeatedly

credibly confessed under oath that they committed the crime, providing detailed

accounts which are consistent with the physical evidence and witness descriptions of

the crime. Both have sworn repeatedly that Lamar Johnson was not present and had

absolutely no involvement in the murder.

46.     Consistent with his innocence, no physical or forensic evidence ever implicated

Johnson in the crime.

47.     Johnson had no motive to harm Boyd; they were good friends and had even

lived together for a time. Johnson's ex-girlfriend and mother of his child, Pamela

Williams, was a cousin and close friend of Boyd's girlfriend, Leslie. For years the four

had socialized frequently; although Johnson had spent less time with them now that

he was dating someone else, there was no ill will between them.

48.     After independent investigation, in 2019 the CIU conclusively found that

Johnson is actually innocent: "Johnson did not shoot Boyd and had nothing to do with

Boyd's murder." The CIU concluded it had an obligation to take action to rectify the conviction and ongoing imprisonment of an innocent man.

49.     After a five-day evidentiary hearing in December of 2022, on February 14, 2023, the Honorable David Mason of the Twenty-Second Judicial Circuit found by clear and convincing evidence that "Lamar Johnson is innocent and did not commit the murder of Markus Boyd either individually or acting with another."

### Defendants incorrectly fixate on Lamar Johnson

50.     SLMPD officers arrived at the scene of the shooting within minutes and were soon joined by investigators including Homicide Detectives Ronald Jackson, Clyde Bailey, and Joseph Nickerson, who would lead the investigation.

51.     Leslie reported to the first officers to arrive that Boyd had been on the front porch talking with "Greg" when Boyd was shot by an unknown person in a black hooded shirt. Officers canvassed the neighborhood and consistently heard from witnesses that the gunmen fled on foot.

52.      Shortly before midnight Defendants Jackson[5] and Bailey interviewed Leslie in an interview room at police headquarters.

53.     Leslie told them that a white man named "Greg" was on the porch with Boyd when he was shot. Leslie told Defendants that she knew Greg because he and Boyd had worked together, and Greg also bought crack cocaine from Boyd.

---

[5] Detective Ronald Jackson was later charged by federal indictment on October 8, 2009, for his leadership role in a criminal scheme to steal seized property from persons he arrested. *See United States v. Ronald Jackson et al.*, Case No. 4:09-CR-00650-RWS. Jackson pled guilty on December 17, 2009, and was sentenced to 18 months in the custody of the Bureau of Prisons on April 23, 2010. *Id*.

54.     Leslie told Defendants Jackson and Bailey she had seen the shooting but could not identify anything about either gunman because they were wearing masks. She told them she did not recognize the gunmen.

55.     Leslie told Defendants Jackson and Bailey that after shooting Boyd, the masked gunmen fled on foot.  Leslie told them where Greg Elking worked and the area where he lived.

56.     Defendants Jackson and Bailey completed their incident summary on the night of the shooting. Less than three hours after Boyd was killed, despite the absence of any evidence implicating Johnson and before any of Defendants had identified, located, or interviewed Elking—the only witness on the porch when Boyd was killed—Defendants named Johnson as the primary suspect.

57.     Amid the record number of murders in St. Louis in the early 1990s, Defendants faced pressure to close cases. They knew they could engage in misconduct to close cases without facing repercussions—exactly as they would do in this case.

58.     Defendants would continue to focus on Johnson throughout the investigation. And when no true or reliable evidence implicated him—because he was innocent—they fabricated some.

### Defendants attempt to fabricate a motive

59.     One immediate problem with Defendants' attempt to build a case against Lamar Johnson was that Johnson had no motive to harm Boyd. The two had been close and remained friends, even though they had recently spent less time together.

Although both men had engaged in small-scale drug dealing on the side of their day jobs, and had at times shared customers, there was no animosity between them.

60.     In the days after the murder, Defendant Nickerson interviewed several of Boyd's customers and reported that they had all described to him animosity between Boyd and Johnson related to drug-dealing which could have provided a motive for Johnson to murder Boyd.

61.     These reports were fabricated by Defendant Nickerson. There was no such dispute or feud.

62.     Specifically, Defendant Nickerson reported that a former customer of both Boyd and Johnson, Ed Neiger, told him of a feud between the two and that the feud might be a reason Johnson would kill Boyd.

63.     This was false. Neiger never said this to Defendant Nickerson. Neiger did not know of any fights or feud between Johnson and Boyd (because there weren't any). He also did not know of anyone who would want to kill Boyd.

64.     Defendant Nickerson also reported that another customer of both Boyd and Johnson, Dawn Byrd, told him that the day before the murder Johnson told Byrd he was going to see Boyd about a drug dispute, and that Byrd had been worried about what was going to happen between Boyd and Johnson and called Boyd's girlfriend Leslie to warn them.

65.     This was false. Byrd never said this to Defendant Nickerson. Byrd did not know of any disagreement between Johnson and Boyd—because there wasn't one. Nor had

Johnson ever said anything to Byrd suggesting there was such a dispute or that he was going to confront Boyd, as Defendant Nickerson's report falsely claimed.

66.     Defendant Nickerson further reported that another customer, Kristine Herrman, had warned Leslie on the day Boyd was shot that Johnson was upset about a drug dispute with Boyd and intended to come see Boyd.

67.     This was false. Herrman never said this to Defendant Nickerson. Herrman did not know Johnson or observe him upset about any drug dispute, and she did not see Leslie the day Boyd was killed or say anything to her about Johnson at all.

68.     Defendant Nickerson also reported that Leslie had recounted similar evidence suggesting Johnson had a motive to kill Boyd. He claimed that Leslie told him that there had been a dispute between Johnson and Boyd about missing drugs and stolen money.

69.     Again, this was false.  Although Leslie knew that Boyd and Johnson were in less frequent contact at the time Boyd was killed, she did not know of any reason that Johnson would want to kill Boyd—because there wasn't one.

70.     Defendant Oldani signed and approved Defendant Nickerson's report containing these numerous fabrications. Defendant Oldani directed, approved, and/or acquiesced to Nickerson's fabrications, and was aware that Defendant Nickerson fabricated these reports.

### *Nickerson fabricates an identification from Elking*

71.     Elking avoided Defendants for nearly four days. On November 3, 1994, Elking finally returned Defendant Nickerson's calls.

72.   Elking told Defendant Nickerson that the two gunmen wore masks and dark clothing and that he did not know or recognize the gunmen. He could provide almost no description of them.

73.   On November 3, Elking and Defendant Nickerson met at a diner and Elking again truthfully told Defendant Nickerson that he did not recognize the gunmen, that he never saw the gunmen's faces well enough to identify them, and that he did not know who Boyd associated with.

74.   Defendant Nickerson nevertheless pressured Elking to make an identification.

75.   Defendant Nickerson showed Elking a set of five polaroids. Included in the five-photo array were photographs of Johnson and Phillip Campbell—one of the true perpetrators.

76.   Elking could not and did not make an identification from the array, which he clearly communicated to Defendant Nickerson.

77.   Defendant Nickerson told Elking that Defendants knew who was responsible for killing Boyd, even though they had no evidence. Defendant Nickerson told Elking they needed him to identify Johnson because Johnson was a dangerous killer. These prejudicial statements were both false and improperly suggestive.

78.   Elking believed Defendants and trusted that they were telling him the truth and that they had evidence Johnson killed Boyd.

79.   Defendant Nickerson offered to "help" Elking at the diner. Defendant Nickerson told Elking that he could help him with his finances and living expenses.

80.    Despite Defendant Nickerson's blatantly improper suggestion, Elking still did not make any identification of Johnson from the array.

81.    Defendant Nickerson nevertheless falsely told Dwight Warren, Assistant Circuit Attorney and Chief Warrant Officer, that Elking had identified Johnson from the five-photo array.

82.    As a result of Defendant Nickerson's false statement that Elking had identified Johnson from the array, Warren issued a "wanted" for Johnson on November 3, 1994.

### *Defendants fabricate false admission from Johnson*

83.     Once the "wanted" was activated, Defendant Henderson assigned several officers to locate and apprehend Johnson. A short time later, Defendants Stittum and Bailey stopped Johnson and Phillip Campbell.

84.    Defendant Nickerson arrived at the scene of the stop and Defendants Nickerson, Bailey, and Stittum conducted a warrantless search and seizure of Johnson's vehicle.

85.    No guns, ammunition, drugs, or money were found in Johnson's vehicle.

86.    Johnson and Phillip Campbell were taken to police headquarters where they were placed in separate interview rooms.

87.    Defendant Nickerson interviewed Johnson.

88.    Johnson told Defendant Nickerson he did not kill Boyd and that Boyd was his friend. He told Defendants where he was and who he was with when Boyd was killed, and that he would willingly participate in a lineup.

17

89.    While Defendant Nickerson left to find Elking and bring him to headquarters, Defendant Ralph Campbell entered the interview room where Johnson was waiting.

90.    In his report, Defendant Ralph Campbell claimed that after telling Defendant Nickerson he didn't kill Boyd and giving him information about his alibi, Johnson then blurted out a damning admission: that he "shouldn't have let the white guy live."

91.    Defendant Ralph Campbell's report is false. As Johnson has consistently proclaimed for nearly 30 years, he is innocent; he never made this statement to Defendant Ralph Campbell or anyone else.

92.    Defendant Ralph Campbell fabricated this report of Johnson's alleged admission. Before leaving the interview room, Defendant Ralph Campbell told Johnson "The pen is mightier than the sword."

### Defendants fabricate false identifications from lineup

93.    Defendant Nickerson picked up Elking and brought him to the station to view lineups containing Johnson and Phillip Campbell.

94.    During the drive to headquarters, Defendant Nickerson continued his efforts to manufacture an identification and frame Johnson.

95.    Defendant Nickerson told Elking the Defendants would "help" him and that they were counting on Elking to identify Johnson.  Defendant Nickerson told Elking that Boyd was killed in a drug deal gone bad and that police "know who it is." Defendant Nickerson told Elking they needed him to protect the community and bring justice to Boyd and his family. Defendant Nickerson told Elking that Defendants "knew" Johnson killed Boyd.

18

96.    The first lineup procedure began at 9:56 p.m. with Defendants Nickerson, Bailey, and Stittum present. Three Black men were pulled from holding to stand as fillers. Johnson stood in position 3.



97.    Elking viewed the lineup and told Defendants Nickerson, Bailey, and Stittum he did not recognize anyone. But Defendants Nickerson, Bailey, and Stittum were unsatisfied and made Elking try again.

98.    After Defendants Nickerson, Bailey, and Stittum made Elking view the lineup containing Johnson at least three times, Elking again told Defendants he could not make an identification.

99.    But Defendants, including Defendants Nickerson, Bailey, and Stittum, remained unsatisfied and continued to improperly pressure Elking to make an identification, even though he had repeatedly told them he could not.

100.   Finally, bowing to Defendants' pressure, Elking identified position 4, a man named Donald Shaw, as the person who looked "closest" to one of the gunmen on the porch. Shaw was a non-suspect and filler pulled from the City Jail holdover cells.

101.   In the lineup containing Phillip Campbell, one of the men who Elking had observed killing Boyd, Elking didn't recognize anyone.

102.   When both lineup procedures were complete, Elking had failed to identify Defendants' suspects. There was no evidence to justify the continued detention of Johnson or any basis to seek a prosecution of him.

103.   That should have marked the end of the pursuit of Johnson. Instead, Defendants, including Defendants Nickerson, Bailey, and Stittum, fabricated an identification.

104.   Defendant Nickerson reported that, while he was escorting Elking in the elevator immediately after the lineup, Elking told Defendant Nickerson he was scared. Defendant Nickerson reported that Elking independently identified both Johnson and Phillip Campbell. Defendant Nickerson claimed that Elking told Defendants Nickerson, Bailey, and Stittum that he was scared and that he lied when he didn't identify the shooters from the lineup. Defendant Nickerson reported that Elking knew it was Johnson in the first lineup and Phillip Campbell in the second lineup.

105.   This report is a fabrication. In reality, in the elevator Defendant Nickerson told Elking which position Johnson and Phillip Campbell had been in in each lineup.

106.   As a result of Defendants' persistent improper pressure and blatant suggestion, Elking acquiesced to the statement they wrote identifying Johnson and Phillip Campbell as the masked men who killed Boyd.

107.   Armed with the fabricated identification, Defendants booked Johnson and Phillip Campbell. Defendants told Johnson he had been identified as one of the shooters.

108.   This open and notorious misconduct—occurring in and throughout the SLMPD police station—could not have occurred without the knowledge and acquiescence of the supervisors of Defendant Detectives, including Defendants Henderson, Burgoon, and Oldani.

109.   As the direct supervisor on this homicide investigation, Defendant Burgoon had knowledge of all investigative activity on this homicide, including the Defendant Detectives' fabricated "identification" from Elking, which he either acquiesced to or directed.

### *Elking goes on Defendants' payroll*

110.   The next morning, November 4, 1994, Defendant Nickerson, with his supervisors' approval, requested that the Circuit Attorney's Office issue first-degree murder and armed criminal action charges against Johnson. Defendant Burgoon reviewed and approved Defendants' application.

111.   That same day, Defendant Nickerson arranged with the Circuit Attorney's Office to compensate Elking for his cooperation.

112.   The payments to Elking started immediately. Elking left the Circuit Attorney's office on November 4, 1994, with $250 cash and a contact in the Circuit Attorney's Office who would oversee paying him.

113.   For more than a year, the Circuit Attorney's Office paid Elking—personally and on his behalf—for his assistance in prosecuting Johnson, paying his debt for back utilities, rent, moving expenses, and providing cash and money for formula, diapers, and living expenses. Elking was paid at least 12 separate times, totaling more than $4,000.

114.   Upon information and belief, the payments to Elking were made against the St. Louis, Missouri Board of Police Commissioners and drawn from its bank accounts.

115.   Defendants knew Elking's identification was unreliable, false, and the product of their intimidation, coercion, and undisclosed payments and "favors."

116.   Defendants knew they manipulated and incentivized Elking's false identification of Johnson. That information was best kept secret, they decided. Neither Defendants nor the Circuit Attorney's Office disclosed the records of these consistent payments. For more than a quarter-century, the Defendants' scheme worked.

### Defendants fabricate a statement from an unreliable jailhouse snitch to bolster their manufactured case

117.   On November 5, 1994, Defendant Jackson interviewed William Mock, a severe drug addict and career criminal, who was in the holdover unit of the St. Louis City Jail, as were Johnson and Phillip Campbell. Mock was a repeat informant with a

history of avoiding his own criminal charges by offering to implicate prisoners in the cells around him.

118.   Johnson and Phillip Campbell were booked into the holdover unit, the same unit as Mock, on November 4. The three were never in the same cell. The holdover unit is loud and crowded, with frequent turnover and activity.

119.   While Mock was willing to provide false evidence in exchange for benefits, any statements he volunteered on his own were obviously unreliable, illogical, and/or downright false.

120.   Defendant Jackson fed Mock information about the crime and Defendants' suspects and theory in an attempt to make Mock's statements seem more reliable.

121.   Defendant Jackson reported that Mock had volunteered that he had overheard Johnson make incriminating statements about his involvement in the crime, including allegedly instructing an accomplice named "Lamont" to retrieve evidence and have his mother provide a false alibi for him.

122.   This was completely false; Johnson never said anything of the kind to anyone. Defendant Jackson knew that Mock's statement was false.

123.   Defendants Jackson and Crawford interviewed Mock again on November 6 and fed him more information about the crime and investigation in an attempt to create a more convincing statement from Mock.

124.   As a result of that meeting, Mock then claimed to have heard a new incriminating statement: that Johnson allegedly told Phillip Campbell that the police

"don't have the gun" and "don't have the white boy. And as long as the white boy ain't snitching we're cool…."

125.    This was false. Johnson never said anything like that to Phillip Campbell. Mock's statement was fabricated with the assistance of Defendants Jackson and Crawford. Defendants Jackson and Crawford knew that Mock's new alleged statement was completely unreliable and/or false. Defendants also misrepresented the circumstances of obtaining the statement from Mock in an attempt to make it appear reliable.

126.    Mock also claimed to fortuitously overhear Johnson and Phillip Campbell discuss a different, unrelated homicide.

127.    Mock claimed to have heard Phillip Campbell ask Johnson "about the robbery we did on the south side and the white boy you shot…. You didn't have to kill him."

128.    Defendants, including Defendants Jackson and Crawford, checked into this other alleged homicide, though they willfully failed to document the false and impeaching statement in their police report. Defendants found nothing and knew what Mock told them was false.

129.    Defendants, including Defendants Jackson and Crawford, knew Mock was not credible and the story he gave them was demonstrably false.

130.    Mock's gambit worked even better than it had just two years before, in Jackson County, Missouri, where he had received reduced charges in exchange for informing on other defendants. This time, no charges were pursued against him in St. Louis, and instead, he was released to Jackson County on the probation-violation warrant.

131.   Defendant Jackson reported the fabricated statements in a memo to Defendant Oldani in which Defendant Henderson was copied. Defendants Henderson and Oldani directed, approved, and/or acquiesced and were aware of the misconduct of Defendants Jackson and Crawford.

132.   As the direct supervisor on this homicide investigation, Defendant Burgoon had knowledge of all investigative activity on this homicide, including the Defendant Detectives' fabricated statements from Mock, which he either acquiesced to or directed.

### Defendants' investigative failures evidence their intent to frame Johnson

133.   At nearly every opportunity, Defendants failed to take obvious steps necessary for any good faith investigation into Boyd's homicide.  The failures were flagrant and willful.

134.   Defendants never applied for a single search warrant. No physical evidence ever connected Johnson to Boyd's murder.

135.   Defendants never investigated Boyd or who had motive to kill him. Defendants did not conduct a single interview into who Boyd associated with or his activities, other than those focused on framing Johnson.

136.   Even though Johnson told Defendants where he was and who he was with when Boyd was killed, Defendants did not conduct a single interview of named alibi witnesses.

137.   Even though Leslie told Defendants she was on the phone with Johnson and Pam shortly after Boyd was killed, Defendants did not request Leslie's, Pam's, or

Johnson's telephone and pager records—a basic investigative task if the goal of the investigation was to determine the truth.

138.   Defendants never bothered to investigate or even attempt to explain how Johnson and Phillip Campbell could have rendezvoused to commit this crime even though the undisputed evidence was that they were not together either before or after the shooting.

139.   Defendants made no attempt to determine a motive for Johnson, even after the motive that Defendant Nickerson manufactured in the police report unraveled during pretrial depositions.

140.   Particularly given the obvious weakness of the case against Johnson—which was based entirely on evidence they had fabricated—if Defendants truly believed he was guilty and were operating in good faith, they would have pursued these investigative steps to shore up the prosecution.

141.   As the direct supervisor on this homicide investigation, Defendant Burgoon had knowledge of all investigative activity on this homicide, including the Defendant Detectives' investigative failures.

### *Defendant Nickerson fabricates evidence to falsely contradict Lamar Johnson's alibi*

142.   At the time of the shooting Johnson was across town, in the Tiffany neighborhood with his then-girlfriend Erika Barrow and friends Anita Farrow and Robert Williams. He truthfully reported this whenever asked, beginning in phone calls with his ex-girlfriend Pam and her cousin (Boyd's girlfriend) Leslie soon after

the crime. Johnson repeated the same truthful account of his whereabouts to Defendants at the time of this arrest.

143.   Before trial, Johnson's lawyer served notice of an alibi defense, listing three alibi witnesses: Erika Barrow, Anita Farrow, and Robert Williams.

144.   Defendants had no reliable evidence to contradict or undermine this truthful alibi.

145.   Undeterred, Defendant Nickerson fabricated evidence, which he reported to the prosecutor. Specifically, Defendant Nickerson falsely claimed that it took no more than five minutes to travel from 3907 Lafayette in the Tiffany neighborhood to the scene of the shooting in Dutchtown, and that he had personally driven the route dozens of times and could confirm that travel time.

146.   This report was false. It was not possible to travel from 3907 Lafayette to the scene of the shooting—a distance of nearly three miles on city streets—in five minutes and Nickerson had not done so.

147.   As the direct supervisor on this homicide investigation, Defendant Burgoon had knowledge of all investigative activity on this homicide, including Nickerson's fabricated and false report concerning the time it took to drive between the two locations, which he either acquiesced to or directed.

148.   In reliance on Nickerson's false report, the prosecution discounted the significance of Johnson's alibi.

### *Lamar Johnson is convicted based on a false and coerced identification and the perjured testimony of a mentally ill drug addict who Defendants knew was lying*

149.   The State's case at trial was exceptionally weak. It rested primarily on the fabricated and suggested identification from Elking, as well as the fabricated evidence that Johnson had blurted out admissions to Defendant Ralph Campbell and to Mock, an experienced and calculating jailhouse snitch. No physical or forensic evidence implicated Johnson, because he is innocent.

150.   Johnson presented alibi evidence that he was in the Tiffany neighborhood with friends and his girlfriend at the time of the crime. However, that was undermined by the evidence Defendant Nickerson fabricated that it was possible to travel that distance in "no more than five minutes."

151.   Based solely on false evidence Defendants manufactured, and void of the exculpatory evidence Defendants hid, on July 12, 1995, the jury convicted Johnson on both counts for murder and armed criminal action.

152.   On July 28, 1995, before sentencing, Johnson wrote a letter to Judge Shaw, stating that "a few days after my conviction I received several notes and letters from my co-defendant Phillip Campbell. In these letters Phillip admits his involvement and identifies a second individual involved who was not charged." Johnson also denied involvement in Boyd's death, as he did for the nearly thirty years he spent wrongfully imprisoned.

153.   On August 4, 1995, Johnson's attorney David Bruns filed a timely Motion for New Trial arguing the trial court erred in several rulings and requesting an

evidentiary hearing "to determine whether newly discovered evidence is now available . . . that Phillip Campbell and another, not Lamar Johnson, committed the murder of Marcus Boyd." They requested an evidentiary hearing "to present newly discovered evidence that the defendant is innocent of the murder of Marcus Boyd."

154.   Although Defendants were on notice on August 4 that there was potentially exculpatory evidence of Johnson's innocence in the form of letters from Phillip Campbell, they did not execute a search warrant at the St. Louis City Jail to locate these letters until beyond Johnson's deadline for his Motion for New Trial.

155.   Just as Johnson had written to Judge Shaw on July 28, Defendants found and seized numerous handwritten letters during the search in which Phillip Campbell admitted his own involvement in the crime and that Johnson was innocent.

156.   The State objected to consideration of the letters as part of Johnson's new trial motion on procedural grounds, and the trial court denied Johnson's request for a new trial and proceeded with sentencing.

157.   Although the trial court noted it was bothered by Johnson's letter and assertion of innocence, it felt constrained to sentence in accordance with the jury's guilty verdict. Johnson was sentenced to life without the possibility of parole for the first-degree murder charge and life for the armed criminal action charge.

158.   For the next two decades, Johnson, often *pro se*, continued to assert his innocence through various appeals, motions for postconviction relief, a second motion for new trial filed in both the trial court and the Eastern District Court of Appeals, a consolidated direct appeal, a federal habeas corpus action, and four state habeas

corpus actions under Missouri Supreme Court Rule 91. All were denied on procedural grounds without review of Johnson's innocence or misconduct claims.

159.   During those more than twenty years, the evidence of innocence continued to mount. Phillip Campbell and Howard maintained their confessions that they killed Boyd in multiple conversations, writings, and sworn statements, including in 1995, 1996, 2002, 2005, and 2009.

160.   In 2003, Elking wrote to Reverend Larry Rice in St. Louis asking for help to correct his perjured and coerced identification. He wanted to tell someone what happened, and hoped confessing to Reverend Rice would clear his conscience. Elking explained that he had never been able to identify the gunmen because he had not seen their faces, and that Defendants had used suggestion and coercion to get him to identify them. He also explained how he had been paid to identify them in court.

161.   For the next twenty years, Elking maintained that his identification of Johnson was false and manufactured by Defendants in writings, sworn statements, and testimony.

162.   Johnson and his innocence counsel collected voluminous records of Mock's undisclosed criminal history and ultimately obtained writings with Mock which documented secret deals, favors, and knowledge that Mock was a severe drug addict, informant, and a documented liar.

163.   In 2018, armed with overwhelming evidence of innocence and official misconduct, Johnson's counsel approached the newly established Conviction Integrity Unit of the Circuit Attorney's Office and requested a review of his case.

### *The Conviction Integrity Unit reviews Johnson's case*

164.   Between 2018 and 2019, the CIU of the Circuit Attorney's Office reviewed Johnson's case and accepted it for further investigation.

165.   In 2019, the CIU uncovered more than sixty pages of records documenting payments and benefits given to Elking for his testimony and never disclosed to Johnson or the jury that decided his fate. Just as Elking had told Reverend Rice in 2003, the records demonstrated that Elking was paid for his identification.

166.   Although these files documenting the payments to Elking were maintained by the Circuit Attorney's Office, they had been segregated from other case files and not shared with individuals responsible for making disclosures as part of the prosecution or post-conviction proceedings. As a result, not only had these files not been disclosed as *Brady* material during the initial prosecution, but during years of post-conviction requests by Johnson and his counsel, the Circuit Attorney's Office represented that no such files existed.

167.   Upon information and belief, the St. Louis, Missouri Board of Police Commissioners issued checks to Elking through the Office of Victim Services and maintained files documenting these payments. But the Board segregated the payments from other case files and did not share them with individuals responsible for making *Brady* disclosures or responding to records requests. The Board did not disclose these payments to Johnson and his counsel. The payments were made against the account of the Board.

31

168.    Also buried in the Circuit Attorney's files were letters between Mock and the Circuit Attorney's Office which revealed the extent of the "deal" with Mock, Mock's racial animus toward Johnson, and just how desperate and committed Defendants and Warren were to their conspiracy to convict Johnson and violate his constitutional rights.

169.    After more than a year of investigation, record collection, and interviews, the CIU determined that Defendants' misconduct, the suggestive and coerced identification by Elking, manufactured and perjured testimony, and the failure to disclose exculpatory evidence caused Johnson's wrongful conviction.

170. The CIU report determined that "without Elking's manufactured identification, Johnson would never have been arrested or charged with this crime. There was no evidence linking him to the homicide until Elking identified him." The report continued, "The testimony of Mock, the State's incentivized witness was and is not credible." The CIU determined that it did "not believe that Johnson volunteered a confession to Detective Campbell after he denied involvement at arrest, during questioning, throughout trial, and for the twenty-four years thereafter." Finally, the Circuit Attorney's Office concluded that "Johnson had nothing to do with Boyd's murder."

171.    As a result of the CIU's investigation, on July 19, 2019, the St. Louis Circuit Attorney filed a Motion for New Trial Based on Newly Discovered Evidence of Innocence, Perjury and False Testimony. The motion was denied without a hearing

because it fell outside the standard 30-day deadline, which led to an appeal that raised technical and appellate issues.

### *Johnson's case changes Missouri law*

172.    The case garnered local and national attention after the overwhelming volume of evidence of Johnson's innocence was made public by the CIU, and also because the case exposed the absurd legal and procedural hurdles in Missouri law: the prosecutor's office that convicted Johnson offered compelling and corroborated evidence that he was innocent and had been convicted through Defendants' willful misconduct, yet the prosecutor was powerless to free him and he remained in prison.

173.    The Supreme Court of Missouri accepted the CIU's appeal and ultimately affirmed the trial court's denial of the Circuit Attorney's Motion for New Trial on purely procedural grounds, finding that the motion was untimely under existing rules and that Missouri law provided no mechanism for prosecutors to correct wrongful convictions obtained by their office. The Court called upon the legislature to address this unjust gap in Missouri procedure and provide a mechanism for Missouri prosecutors to correct wrongful convictions. *State v. Johnson*, 617 S.W.3d 439, 446 (Mo. 2021) (Draper, J., concurring) ("Unless and until the legislature adopts a law authorizing a circuit or prosecuting attorney to file a motion for new trial upon discovery of evidence indicating a wrongful conviction" Missouri prosecutors have no authority to fulfill their duty to correct an injustice).

174.    The Court did not decide Johnson's case on the merits but noted that Johnson presented "newly discovered evidence, evidence of perjury, and *Brady* violations that,

if proved, would result in Mr. Johnson's exoneration." *Johnson*, 617 S.W.3d at 447 (J. Stith concurring). "And most or all of this evidence could not reasonably have been known to Mr. Johnson at the time of trial because of the police's or prosecution's alleged complicity in manufacturing false evidence, presenting false testimony, and failing to produce exculpatory evidence." *Id*.

175.   Within weeks of the decision denying Johnson relief on procedural grounds, in May of 2021, the Missouri General Assembly answered the Court's mandate by enacting Section 547.031, which for the first time gave Missouri prosecutors, including the St. Louis Circuit Attorney, the authority to file motions to vacate or set aside wrongful convictions.

### *Johnson is exonerated*

176.   Utilizing the law the legislature created for Johnson, on August 31, 2022, the Circuit Attorney filed a *Motion to Vacate or Set Aside Judgment*, and an evidentiary hearing was held on December 12 through 16, 2022, where the Court received testimony and record evidence establishing Johnson's innocence and constitutional violations committed by Defendants during the investigation and trial.

177.   Elking's testimony that he could never identify the shooter remained consistent with the undisputed facts of the crime and the testimony of the only other witness present at the scene, Leslie Williams. The Court found that when the crime occurred, the only illumination was from a bulb at the top of the stairs to the upstairs apartment, and the shooters wore ski-like masks which covered the entire face and head of the gunmen except for the eyes.

178.   Elking credibly recounted that he could not identify anyone, testifying consistent with prior statements that "he had no idea" who the masked gunmen were. The Court found that Elking's memory of events was corroborated by Howard's account and by the physical evidence.

179.   Given the circumstances of the crime–including that it was late at night, the porch was not illuminated, the shooters wore masks to conceal their faces–as well as the suggestive nature of the lineup procedures, the Court found that Elking's trial testimony identifying Johnson as one of the perpetrators was not reliable or credible and was the product of Defendants' suggestion.

180.   Elking testified that in exchange for his identification, he received payments for housing assistance and help with several warrants and traffic tickets. The first payment began immediately after the identification was made and the payments continued for many months.

181.   The Court found that Elking's memory of events was corroborated by documentary evidence of the payments Elking received from Victim Services. The Court found that these payments and benefits given to Elking were not disclosed, in violation of Johnson's right to due process.

182.   Warren testified there was "no evidence" against Johnson without the identification and that without Elking's testimony, he could not have filed charges against Johnson: "Oh, absolutely not. I mean, I didn't have any evidence."

183.   The Court determined that the identification from Elking was the central and only piece of direct evidence against Johnson at trial, was "overly suggestive," and

was "almost a textbook case of suggestive identification." The Court determined the admission of the overly suggestive identification at trial violated Johnson's right to fundamental fairness, stating "the evidence is clear that Johnson was denied his Due Process right to a fair trial. First, the police so directly interfered with the identification of Lamar Johnson by Greg Elking that the in-court identification was tainted by undue suggestion."

184.   The Court determined that Howard's confessions and 2022 testimony about how and why Boyd was killed was credible and corroborated by Howard and Phillip Campbell's prior statements and writings, the physical evidence, and what Elking witnessed. In addition, Howard committed a very similar robbery and murder of a drug dealer in St. Louis on October 8, 1997, for which he was subsequently convicted of murder. In that case, Howard and others planned the robbery of a known drug dealer at Howard's house. The men, including Howard, wore masks and dark clothing when they robbed, killed, and assaulted the victims in that case, just as Howard and Phillip Campbell did the night they killed Boyd.

185.   As to Mock, the Court found that his trial testimony should never have been admitted because it was patently unreliable. Further, the Court found that the State had violated Johnson's constitutional rights when it failed to disclose Mock's voluminous criminal and informant history.

186.   The Court concluded by declaring Johnson innocent: "this Court finds the testimony of Elking and of James 'BA' Howard to be credible in light of all the circumstances. This combined testimony amounts to clear and convincing evidence

36

that Johnson is innocent and did not commit the murder of Boyd either individually or acting with another."

187.    The Court vacated Johnson's convictions and ordered the State of Missouri to unconditionally discharge him. After more than 28 years in prison for a crime he did not commit, on February 14, 2023, Johnson left the courthouse a free man, fully exonerated for the murder of his friend.

## DAMAGES

188.    The unlawful, intentional, willful, deliberately indifferent, and reckless acts and omissions of Defendants Nickerson, Bailey, Jackson, Campbell, Stittum, Crawford, Henderson, Oldani, and Burgoon caused Lamar Johnson to be improperly arrested and imprisoned, unfairly tried, wrongfully convicted, and forced to serve 28 years, 3 months, and 10 days—10,329 days—in jail and prison for crimes he did not commit.

189.    As a direct result of Defendants' actions and omissions, Johnson sustained injuries and damages, including loss of his freedom for more than 28 years, loss of his youth, pain and suffering, mental anguish, emotional distress, indignities, degradation, permanent loss of natural psychological development, and restrictions on all forms of personal freedom including, but not limited to, diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and freedom of speech and expression.

190.    As a direct result of Defendants' actions and omissions, Johnson was deprived of his familial relationships, including his relationships with his parents, siblings, and daughters, who were four months and fifteen months old at the time of his wrongful arrest.

191.    As a direct result of Defendants' actions and omissions, Johnson sustained economic injuries and damages, including loss of income and loss of career opportunities.

192.    As a direct result of Defendants' actions and omissions, Johnson sustained physical injuries and damages, including physical pain and suffering, personal injuries, physical illness, abuse in prison, and inadequate medical care.

## CAUSES OF ACTION

**COUNT I: 42 U.S.C. § 1983 Deprivation of Liberty without Due Process of Law and Denial of a Fair Trial by Fabricating Evidence, Withholding Material Exculpatory and Impeachment Evidence, and Conducting a Reckless Investigation**

*Against Individual Defendants Nickerson, Bailey, Jackson, Campbell, Stittum, Crawford, Henderson, Oldani, and Burgoon*

193.    Plaintiff incorporates by reference all of the foregoing paragraphs.

194.    The Individual Defendants, individually and in concert, fabricated false evidence to support Lamar Johnson's conviction, suppressed exculpatory and impeachment evidence, failed to investigate in a manner that shocks the conscience, and instead followed through with the unlawful prosecution of Johnson, thereby depriving Johnson of his right not to be deprived of liberty without due process of law.

The Individual Defendants caused false evidence to be used against Johnson in his prosecution and at trial.

195.   The Individual Defendants ignored clear evidence that Johnson was innocent, and rather than investigate the homicide of Markus Boyd, intentionally and in bad faith set about to violate Johnson's due process rights.

196.   The Individual Defendants intentionally and/or recklessly fabricated false evidence inculpating Johnson. For example, they intentionally and/or recklessly fabricated that Greg Elking, the sole witness to the murder of Boyd, identified Johnson as one of the gunmen, including without limitation in the following manner:

    a.  Defendant Nickerson improperly pressured Elking to identify Johnson as one of the masked gunmen. Despite that Elking truthfully communicated to Defendants that he did not recognize the gunmen and could not identify them, Defendant Nickerson falsely reported that Elking had identified Johnson's photo in a five-photo array.

    b.  In an attempt to bolster this manufactured identification, Defendants Nickerson, Bailey, and Stittum continued to improperly pressure Elking to falsely identify Johnson. After viewing a suggestive lineup containing Johnson at least three times in the presence of Defendants Nickerson, Bailey, and Stittum, Elking picked out a non-suspect pulled from the jail, not Johnson.

    c.  Following the lineup, Defendants continued to pressure Elking, and Defendant Nickerson falsely reported that Elking independently identified

Johnson immediately after the lineup and that Elking had recognized Johnson as a gunman in the first lineup.

d. Defendants pressured and/or coerced Elking to endorse a false statement Defendants wrote identifying Johnson as a gunman who killed Boyd.

197. The Individual Defendants intentionally and/or recklessly fabricated statements from William Mock, an unreliable and incentivized jailhouse snitch, including without limitation in the following manner:

a. Defendants knew that Mock's statements implicating Johnson were false.

b. To make Mock's statements appear more reliable and convincing, Defendants Jackson and Crawford fed information about the crime to Mock, a career criminal who had a history of falsely implicating defendants in exchange for benefits.

c. Defendants willfully failed to document false and impeaching statements made by Mock, who Defendants knew was not credible.

198. The Individual Defendants intentionally and/or recklessly fabricated evidence to falsely contradict Lamar Johnson's alibi. For example, Defendant Nickerson gave false evidence that undermined Johnson's truthful alibi. Defendant Nickerson falsely reported that he could confirm, based on personal experience, that it was possible to travel from the location of Johnson's alibi to the crime scene in less than five minutes, which, if true, would have weakened Johnson's alibi.

199.   The Individual Defendants intentionally and/or recklessly fabricated evidence that Johnson had a motive to harm Boyd, including without limitation the following evidence:

    a.   Defendant Nickerson fabricated that Ed Neiger reported a feud between Boyd and Johnson.

    b.   Defendant Nickerson fabricated that Dawn Byrd told him of a drug dispute between Boyd and Johnson.

    c.   Defendant Nickerson fabricated that Kristine Herman said that on the day of the crime, Johnson was upset with Boyd about a drug dispute.

    d.   Defendant Nickerson fabricated that Boyd's girlfriend suggested there was a disagreement between Boyd and Johnson about drugs and stolen money.

200.   The Individual Defendants intentionally and/or recklessly fabricated a false admission from Johnson. For example, in an effort to bolster a weak case against Johnson, Defendant Campbell falsely reported that Johnson made an inculpatory statement when he was being interrogated at police headquarters.

201.   In addition, the Individual Defendants concealed and suppressed exculpatory and impeachment evidence as a part of a scheme to deliberately deceive the court in violation of the Constitution, *Brady v. Maryland*, 373 U.S. 83 (1963), its progeny, and related cases.  For example, Defendants incentivized Elking's false identification of Johnson by arranging, in secret, for Elking to be compensated for his assistance in securing Johnson's wrongful conviction. Defendants also suppressed evidence of their investigative misconduct.

41

202.   The Individual Defendants also intentionally and/or recklessly failed to investigate the homicide of Markus Boyd, failing to take even the most minimal investigatory steps to determine who was actually involved. For example, Defendants did not apply for a single search warrant and conducted no investigation into Boyd or his drug connections to determine a true motive for the murder.

203.   The Individual Defendants also intentionally and/or recklessly failed to investigate evidence of Lamar Johnson's innocence. For example, Defendants made no attempt to corroborate Johnson's truthful alibi, failing to interview named alibi witnesses or request material phone and pager records.

204.   The foregoing acts and omissions were deliberate, reckless, wanton, cruel, motivated by evil motive or intent, done in bad faith, and/or involved callous indifference to Johnson's federally protected rights. These acts were perpetrated while the Individual Defendants were acting in their official capacities and under color of state law.

205.   The Individual Defendants not only lied and created false written and verbal reports, but they concealed the existence of and/or failed to develop exculpatory evidence, including evidence pointing to the true perpetrators, and concealed the leading, suggestive, or improper tactics used on their witnesses.

206.   Had the Individual Defendants' fabrications and/or the material exculpatory and impeachment evidence known to them been disclosed, this evidence would have tended to prove Johnson's innocence and cast doubt on the entire police investigation and prosecution.

207.   As a direct and proximate result of the Individual Defendants' actions, Johnson was wrongly prosecuted, detained, and incarcerated for more than 28 years and suffered the grievous injuries and damages set forth above.

### COUNT II: 42 U.S.C. § 1983 Malicious Prosecution in Violation of the Fourth and Fourteenth Amendments

*Against Individual Defendants Nickerson, Bailey, Jackson, Campbell, Stittum, Crawford, Henderson, Oldani, and Burgoon*

208.   Plaintiff incorporates by reference all of the foregoing paragraphs.

209.   The Individual Defendants, acting individually and in concert with malice and knowing that probable cause did not exist to prosecute Lamar Johnson for the murder of Markus Boyd, intentionally caused Johnson to be arrested, charged, and prosecuted for those crimes, thereby violating Johnson's clearly established right, under the Fourth and Fourteenth Amendments of the U.S. Constitution, to be free of prosecution absent probable cause.

210.   The Individual Defendants, acting individually and in concert, fabricated evidence, withheld and misrepresented exculpatory evidence, and failed to investigate in a manner that shocks the conscience, all of which resulted in an arrest and prosecution without probable cause.

211.   The Individual Defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Johnson's clearly established constitutional rights. No reasonable officer in 1994 would have believed this conduct was lawful.

212. The prosecution finally terminated in Johnson's favor on February 14, 2023, when the Circuit Attorney's Office dismissed all charges.

213. The acts and omissions by the Individual Defendants described in the preceding paragraphs were the direct and proximate cause of Johnson's injuries because the Individual Defendants knew, or should have known, that their conduct would result in the wrongful arrest, prosecution, conviction, and incarceration of Johnson.

### COUNT III: 42 U.S.C. § 1983 Civil Rights Conspiracy

*Against Individual Defendants Nickerson, Bailey, Jackson, Campbell, Stittum, Crawford, Henderson, Oldani, and Burgoon*

214. Plaintiff incorporates by reference all of the foregoing paragraphs.

215. The acts and omissions by the Individual Defendants described in the preceding paragraphs were the direct and proximate cause of Johnson's injuries because the Individual Defendants knew, or should have known, that their conduct would result in the wrongful arrest, prosecution, conviction, and incarceration of Johnson.

216. The Individual Defendants and others outside the SLMPD—including in particular Mock as well as others yet unknown—agreed among themselves to act in concert to deprive Johnson of his clearly established constitutional rights as protected by the Fourth and Fourteenth Amendments, including his right not to be deprived of liberty without due process of law.

217. The Individual Defendants engaged in and facilitated numerous overt acts in furtherance of the conspiracy, including, but not limited to, the following:

a. Acting in concert with the other Defendants, Defendant Nickerson used suggestion, manipulation, and pressure when interviewing Elking to fabricate false and unreliable identifications and incentivized Elking's cooperation with undisclosed payments.

b. Acting in concert with the other Defendants and with Mock, Defendant Jackson fabricated false statements from Mock in order to inculpate Johnson and bolster Defendant Nickerson's fabricated identifications from Elking.

c. Acting in concert, Defendants fabricated false evidence that incriminated Johnson, including that Johnson had a motive to harm Boyd and that Johnson provided an inculpatory statement when being interrogated.

d. Acting in concert, in order to procure Johnson's conviction in violation of his constitutional rights, Defendants suppressed impeachment evidence material to Elking's false identifications of Johnson and to Mock's false statements incriminating Johnson.

e. Acting in concert to recklessly investigate the murder of Markus Boyd, including by fabricating false evidence suggesting Johnson's guilt, deliberately ignoring and failing to corroborate evidence of Johnson's innocence, and failing to take any investigatory steps to develop or follow other leads.

218. As a direct and proximate result of the Individual Defendants' overt acts, Johnson was deprived of his constitutional rights; wrongly prosecuted, detained, and

incarcerated for over 28 years; and subjected to other grievous injuries and damages as set forth above.

## COUNT IV: 42 U.S.C. § 1983 Failure to Intervene

*Against Individual Defendants Nickerson, Bailey, Jackson, Campbell, Stittum, Crawford, Henderson, Oldani, and Burgoon*

219.   Plaintiff incorporates by reference all of the foregoing paragraphs.

220.   By their conduct and under color of state law, the Individual Defendants, acting within the scope of their employment with the SLMPD, had opportunities to intervene on behalf of Lamar Johnson to prevent his false arrest, malicious prosecution, false imprisonment, and deprivation of liberty without due process of law, but with deliberate indifference, declined to do so.

221.   The Individual Defendants' failures to intervene violated Johnson's clearly established constitutional right to be free from unreasonable search and seizure and not to be deprived of liberty without due process of law as guaranteed by the Fourth and Fourteenth Amendments. No reasonable police officer in 1994 would have believed that failing to intervene to prevent the Individual Defendants from fabricating inculpatory evidence, withholding material exculpatory evidence, deliberately failing to conduct a constitutionally adequate investigation, and causing Johnson to be arrested and prosecuted without probable cause, were lawful.

222.   The Individual Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Johnson's injuries. The Individual Defendants knew, or should have known, that their conduct would result in Johnson's wrongful arrest, prosecution, conviction, and incarceration.

## COUNT V: 42 U.S.C. § 1983 Supervisory Liability Claim

*Against Individual Defendant Officers Henderson, Oldani, and Burgoon*

223.   Plaintiff incorporates by reference all of the foregoing paragraphs.

224.   Johnson's wrongful arrest, confinement, prosecution, trial, conviction, and incarceration was caused by the unconstitutional action and inaction of Defendants Henderson, Oldani, and Burgoon acting in their individual capacity and under color of law.

225.   Defendant Henderson directly participated in the misconduct that resulted in Johnson's wrongful conviction. Specifically, Defendant Henderson directed Defendant Detectives to apprehend Johnson without reliable evidence, approved reports containing fabricated evidence, and knew that the evidence implicating Johnson was unreliable and that any identification was only the result of suggestion and leading.

226.   Defendant Oldani directly participated in the misconduct that resulted in Johnson's wrongful conviction. Specifically, Defendant Oldani directed, approved, and/or acquiesced to reports containing fabricated evidence. Defendant Oldani knew that the evidence implicating Johnson was unreliable and that any identification was only the result of suggestion and leading.

227.   Defendant Burgoon directly participated in the misconduct that resulted in Johnson's wrongful conviction. Specifically, Defendant Burgoon reviewed and approved the application for charges submitted to the Circuit Attorney's Office, despite the lack of reliable evidence. Defendant Burgoon knew that Elking's

identification was unreliable and only the result of suggestion and leading. As the direct supervisor in charge of the investigation, Defendant Burgoon was aware of the Detectives' fabrications and either acquiesced to or directed them.

228.   Defendants Burgoon, Henderson, and Oldani knowingly refused to terminate the wrongful prosecution of Johnson, which, upon information and belief, they knew or should have known had been initiated based on fabricated evidence, and in spite of suppressed exculpatory information. As a result, Defendants Henderson, Oldani, and Burgoon knew or reasonably should have known that Johnson's constitutional rights to be free from unreasonable seizure and not to be deprived of liberty without due process of law would be violated.

229.   Defendants Henderson, Oldani, and Burgoon culpably failed to adequately train, supervise, discipline, and/or control their subordinates, including Defendants Nickerson, Bailey, Jackson, Campbell, Crawford, and Stittum, who obtained and reported fabricated evidence, suppressed exculpatory information, ignored evidence suggesting Johnson's innocence, and recklessly or otherwise failed to investigate the homicide of Markus Boyd.

230.   Defendants Henderson, Oldani and Burgoon violated Johnson's constitutional rights by acquiescing in the deprivation of Johnson's constitutional rights by their subordinates, and by generally showing a reckless or callous indifference to Johnson's rights.

231.   Defendants Henderson, Oldani, and Burgoon's failure to train, supervise, discipline and/or control their subordinates, their indifference to the actions of their

subordinates, and their indifference to Johnson's rights, encouraged and permitted their subordinates to fabricate evidence, fail to document and disclose exculpatory evidence, ignore evidence suggesting Johnson's innocence, and recklessly or otherwise fail to investigate the homicide of Markus Boyd.

232.   The actions and omissions of Defendants Henderson, Oldani, and Burgoon caused Johnson to suffer constitutional deprivations and grievous personal injuries and damages described above.

### COUNT VI: Malicious Prosecution under Missouri state law

*Against Individual Defendants Nickerson, Bailey, Jackson, Campbell, Stittum, Crawford, Henderson, Oldani, and Burgoon*

233.   Plaintiff incorporates by reference all of the foregoing paragraphs.

234.   The Individual Defendants, acting separately and in concert, individually and in their official capacities, did willfully, unlawfully, maliciously and without probable cause or legal justification, cause Lamar Johnson to be prosecuted, detained, and incarcerated for the murder of Markus Boyd.

235.   Based on Johnson's alibi and a lack of any inculpatory physical evidence, the Individual Defendants knew, or should have known, that Johnson was innocent. Nevertheless, without probable cause, the Individual Defendants caused the commencement of prosecution proceedings against Johnson. The Individual Defendants' conduct was actuated without any proper motive and with malice because the Individual Defendants knew that Johnson was not the actual perpetrator of the crime.

236.   Over 28 years after Defendants maliciously caused the commencement of a false prosecution against Johnson, the proceedings were terminated in Johnson's favor through his exoneration on February 14, 2023, when the Honorable David Mason of the Twenty-Second Judicial Circuit vacated Johnson's conviction. Johnson was released from prison on February 14, 2023, over 28 years after he was arrested for a crime he did not commit, and all charges against him were dropped.

237.   As a direct and proximate result of the Individual Defendants' malicious prosecution of Johnson, Johnson was wrongfully detained and incarcerated and served more than 28 years for crimes he did not commit, and suffered the physical, emotional, and pecuniary damages as described above.

## COUNT VII

### Respondeat Superior under Missouri State Law

*Against the City of St. Louis*

238.   Plaintiff incorporates by reference all of the foregoing paragraphs.

239.   The Individual Defendants were, at all relevant times, employed by the City of St. Louis and/or the SLMPD.

240.   The Individual Defendants were, at all relevant times, acting within the course and scope of their employment with the City of St. Louis, Missouri and/or the SLMPD in that their actions were in furtherance of the investigation of the murder of Markus Boyd, which was the assigned responsibility of each of the Individual Defendants.

241.   Accordingly, Defendant the City of St. Louis is liable as principal for all torts committed by its agents and employees.

## COUNT VIII: *Monell* Claim for the St. Louis Circuit Attorney's Office

### *Against the City of St. Louis*

242.   Plaintiff incorporates by reference all of the foregoing paragraphs.

243.   The City of St. Louis was at all relevant times responsible for the administrative policies, practices, and functions of the St. Louis Circuit Attorney's Office.

244.   The St. Louis Circuit Attorney's Office maintained records of payments made to witnesses in criminal prosecutions through Office of Victim Services.

245.   By their nature, payments made to witnesses are frequently exculpatory and/or impeachment evidence constitutionally required to be disclosed in criminal prosecutions.

246.   However, the St. Louis Circuit Attorney's Office's policy for maintaining these records kept them segregated from employees responsible for producing documents to criminal defendants, including individual prosecutors and employees responding to records requests.

247.   The St. Louis, Missouri, Board of Police Commissioners was responsible for issuing checks made out through the Office of Victim Services, and thus must have maintained records of these payments.

248.   However, the Board of Police Commissioners also kept any records of these payments segregated from employees responsible for producing documents to criminal defendants, and employees responding to records requests.

249.   As a result of these policies, documents substantiating payments made to prosecution witnesses were routinely not disclosed to criminal defendants.

250.   From their inception, these record-keeping policies were substantially certain to cause *Brady* violations. They were maintained in deliberate indifference to the obvious risk constitutional violations would result.

251.   These record-keeping policies caused the suppression of evidence that Elking had been compensated personally and on his behalf more than $4,000 during the criminal prosecution in this case.

252.   These record-keeping policies also caused the continued suppression of this evidence for years during post-conviction proceedings.

253.   As a direct and proximate result of these unconstitutional policies, Johnson was wrongfully detained and incarcerated and served more than 28 years for crimes he did not commit, and suffered the physical, emotional, and pecuniary damages as described above.

**WHEREFORE**, Plaintiff Lamar Johnson prays as follows:

A.   That the Court award compensatory damages to Plaintiff and against all Defendants, jointly and severally, in an amount to be determined at trial;

B.   That the Court award punitive damages to Plaintiff, and against all individual Defendants in their individual capacity, in an amount to be determined at trial, that will deter such conduct by defendants in the future;

C.   For a trial by jury;

D.   For pre-judgment and post-judgment interest and recovery of Plaintiff's

costs, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for

all 42 U.S.C. § 1983 claims; and,

E.   For all other relief to which Plaintiff may be entitled.

**Date:  January 17, 2024**

Respectfully submitted,

Lindsay J. Runnels, Mo #62075
MORGAN PILATE LLC
926 Cherry Street
Kansas City, MO 64106
T: (816) 471-6694
F: (816) 472-3516
lrunnels@morganpilate.com


Emma Freudenberger*
Amelia Green*
Rhianna Rey*
Annie Sloan*
Neufeld, Scheck, Brustin, Hoffmann, &
Freudenberger LLP
99 Hudson Street, 8th Floor
New York, NY 10013
emma@nsbhf.com
amelia@nsbhf.com
rhianna@nsbhf.com
annie@nsbhf.com
T: (212) 965-9081
F: (212) 965-9084

*Attorneys not yet admitted to the Eastern
District of Missouri; applications to practice
pro hac vice forthcoming

**ATTORNEYS FOR LAMAR JOHNSON**