**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| LAMAR ALLAN JOHNSON | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | No. 4:24CV87 HEA |
| CITY OF ST. LOUIS, MISSOURI, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**OPINION, MEMORANDUM AND ORDER**

This matter is before the Court on Defendants Joseph Nickerson, Clyde Bailey, Ronald Jackson, Gary Stittum, Jeffrey Crawford, Robert Oldani, Joseph Burgoon, Christina Ross as Special Administrator of the Estate of Ralph Campbell, and Timothy M. Weaks as Personal Representative of the Estate of Ronald Henderson (collectively "Individual Defendants"), Motion for Summary Judgment, [Doc. No. 179], and Defendant City of St. Louis' Motion for Summary Judgment, [Doc. No. 180]. Plaintiff opposes both Motions. For the reasons set forth below, the Individual Defendants' Motion is granted in part and denied in part. The City of St. Louis' Motion is granted.

**Facts and Background**

Plaintiff brought this action pursuant to 28 U.S.C. §§ 1331, 1343, and 1367 for alleged acts and omissions that occurred within the judicial district of the Eastern District of Missouri. (Plaintiff's Complaint ("Compl."), at ¶¶ 16-17.) He alleges constitutional and state law violations in connection with his arrest, prosecution, and conviction for the October 30, 1994 murder of Markus Boyd. (Ex. 1 at ¶ 1).

Defendants Joseph Nickerson ("Detective Nickerson"), Clyde Bailey ("Detective Bailey"), Ronald Jackson ("Detective Jackson"), Gary Stittum ("Detective Stittum"), Jeffrey Crawford ("Detective Crawford"), Robert Oldani ("Commander Oldani"), Joseph Burgoon ("Sergeant Burgoon"), Ronald Henderson ("Lieutenant Henderson"), and Ralph Campbell ("Detective Campbell") were sworn police officers with the St. Louis Metropolitan Police Department employed by the City of St. Louis at all relevant times. (Defendant City of St. Louis's Answer and Affirmative Defenses to Plaintiff's Complaint ("City Ans. To Compl."), at ¶¶ 22-30).

The City of St. Louis is a constitutional charter city organized and existing under the laws of the State of Missouri. The St. Louis Metropolitan Police Department is a division or agency of the City of St. Louis. (Ex. 2 at ¶ 21).

The City of St. Louis does not have authority or responsibility over the Circuit Attorney's Office. The Circuit Attorney's Office is a separately elected

office governed by state law. (Deposition Transcript of Edward Morris Roth). Under Missouri Revised Statute § 54,440, the Circuit Attorney of the City of St. Louis manages and conducts all criminal cases in the Circuit Court. The Circuit Attorney of the City of St. Louis is a broad and comprehensive authority independent of the City. The City had no duties, powers, authority, or responsibility under Missouri state law, or the city charter, over the Circuit Attorney's Office's policies, procedures, rules, regulations, customs, or practices. (Ex. 3 at 161:9-162:20, 230:7-17: 234:23-237:9).

The Board of Police Commissioners was a state agency, not part of the City of St. Louis during the period of 1983 through 1999. (Ex. 3 at 254:5-23). Local control of the St. Louis Metropolitan Police Department was not returned to the City until September 2013). (Ex. 3 at 88:10-19). In March 2025, Missouri Governor Mike Kehoe signed a bill putting the Department back under the control of a State Board of Police Commissioners.

On Sunday, October 30, 1994, at approximately 9:05 p.m., Markus Boyd was shot and killed in front of his residence at 3910 Louisiana Avenue in St. Louis, Missouri. Boyd was sitting on his front porch at the time of the shooting. Boyd was conveyed to St. Louis University Hospital, where Dr. Yip of the hospital staff pronounced him dead at 9:55 p.m. (Original Incident Report (Cmplt. #94163608), attached hereto as Ex. 4, at 1).

At the time of the shooting, James Gregory Elking, a white male and former co-worker of Boyd's from the Sayer Printing Company, was present on the front porch with Boyd. Elking had gone to Boyd's residence that evening to pay Boyd $40.00 he owed him for two rocks of cocaine. (Clyde Bailey/Ronald Jackson Report (Cmplt. #95016245 Ex. 5, at 5-7; Joseph Nickerson Report (Cmplt. #94166120), Ex. 6, at 3-5, 9).

Boyd's girlfriend, Leslie Williams, was upstairs in the apartment at the time of the shooting with their child. (Ex. 5 at 5-7; Ex. 6 at 3-5). Williams heard approximately three gunshots, ran to the stairs, and observed a subject on the front porch standing over Boyd, dressed in a black hooded shirt, firing shots downward at Boyd. (Id.) Williams also observed a second subject standing on the top step of the front porch, also wearing a black hooded shirt. Williams could not see the faces of either subject. (*Id.*) Williams did not recognize either gunman as someone she knew, and she knew Johnson well.

In support of Defendants' motions for summary judgment, Defendants submit Detective Nickerson's police report. The report contains what he states he was told by various people he interviewed. Plaintiff asserts some of the information contained in this police report includes "fabricated statements."

According to Detective Nickerson's police report, the eyewitness (Elking) stated that two individuals approached from a gangway, both armed with

handguns, and both wearing some type of mask with the eyes and nose area cut out, covering the mouth and the rest of the head. One subject who was about 5’9” tall, was armed with what appeared to be a small-caliber semi-automatic. The second subject, at least 6’0” tall, was armed with some type of revolver. Both subjects were dressed in dark clothing, possibly dark blue or black pants and jackets. (Ex. 6 at 8-11).

Detective Nickerson’s police report further states that the taller subject grabbed Elking by the arm, pulled him from the step, and stated, “Get the fuck up,” while pointing a revolver at Elking’s head. The smaller subject ran to Boyd and mounted Boyd’s shoulders from behind, placing the semi-automatic to the back of Boyd’s shoulders near the head and firing one time. Boyd struggled and stated numerous times, “No, no.” The second subject then placed the revolver to Boyd’s chest or stomach area and fired. Both subjects continued to fire their weapons into Boyd’s body. After the shooting, both subjects fled through the gangway. (Ex. 6 at 8-11).

The report further provides: Williams called 911 at 9:07 p.m. Officers responded to the scene, and Detectives Ronald Jackson and Clyde Bailey of the Homicide Section conducted the scene investigation and initial interviews. (Ex. 5). At 11:55 p.m. that evening, Detectives Bailey and Jackson interviewed Leslie Williams at the Homicide office. Williams stated she could not think of

anyone that Markus had problems with other than Lamar Johnson. (Ex. 5 at 5-7; Deposition Transcript of Clyde Bailey, at 241:1-10). Williams told the detectives that Boyd and Johnson had been partners in selling rock cocaine until approximately six to eight weeks before the murder, when their partnership dissolved because Boyd grew concerned that Johnson's purported involvement in other homicides would bring unwanted police attention to their drug business. (Ex. 5 at 5-7; Ex. 6 at 3-5). Williams reported that after the shooting, she telephoned her cousin Pamela Williams and advised her that Boyd had been shot and that she believed Lamar was responsible. (Ex. 5 at 5-7; Ex. 6 at 3-5). Williams later testified that the "falling out" between Boyd and Johnson was over personal reasons relating to Leslie getting back together with Boyd. (Plaintiff's Ex. 68 (Leslie Williams 2026 Dep.) at 25–28.)

Detectives Bailey and Jackson also interviewed Tondaleria Boyd, Markus Boyd's mother, at the Homicide office that evening. According to the police report, Tondaleria Boyd stated she had been home all day and that at about 8:50 p.m., she was picked up by her boyfriend because she stays with him during the week. Markus and Leslie were gone when she left. She went to her boyfriend's house and tried to call home but the line was busy. She beeped Markus, and when he did not return her call, she continued calling the residence until Leslie answered the telephone and advised her that Markus had been shot. Tondaleria also stated

that the only person she could think of that Markus had problems with was Lamar Johnson. (Ex. 5 at 7-8).

A follow-up investigation was conducted by the Homicide Section, led by Detective Joseph Nickerson. Through this investigation, a number of individuals were identified and interviewed, and information was gathered about the victim and his association with the sales of narcotics. (Ex. 6).

According to Detective Nickerson's report, on October 31, 1994, Detective Nickerson contacted Leslie Williams, who identified the witness on the porch as a former co-worker of Boyd's known to her only as "Greg." (Ex. 6 at 3-5). Williams stated that Greg and Boyd both worked at the Sayer Printing Company and that Greg currently worked for the new Kiel Center. (*Id.*) Williams reiterated that Johnson was the only person with whom Boyd was having problems with, and she detailed the drug-dealing partnership, the falling out, and the subsequent tension between the two men. (*Id.*; Deposition Transcript of Joseph Nickerson, Vol. I, Ex. 8, at 153:20-154:10).

Detective Nickerson also contacted Dawn Byrd and Christine Herrman, associates of Boyd. According to Detective Nickerson's report, Byrd and Herrman stated that Lamar Johnson had been upset about losing some of his drug business to Boyd. Herrman informed Detective Nickerson that Lamar Johnson, before leaving Byrd's house late the night before the shooting, told them he was going by

to see Boyd and "seemed rather upset about the fact that he was losing some of his business to Markus." (Ex. 6 at 5-7).

On November 2, 1994, Detective Nickerson was contacted by the sister of the eyewitness (Elking), who confirmed that her brother had been present when Boyd was fatally shot and was scared and in hiding. Later that morning, the witness's wife also contacted Detective Nickerson, confirming that her husband had witnessed the shooting and was scared. (Ex. 6 at 8). Elking's wife, Kelly Elking, reported that Elking was scared because he had witnessed the shooting and the gunmen saw him. (Id.) Elking was also scared that the police would think he committed the murder because he was the only witness. Ex. 4 (Elking 2024 Dep. at 50.)

On the morning of November 3, 1994, the eyewitness (Elking) contacted Detective Nickerson after Nickerson attempted to reach him several times. Elking contacted Detective Nickerson at the Homicide Office and stated he had decided to come forward. Arrangements were made to meet at 2:00 p.m. at a designated location. (Ex. 6 at 9). At 2:00 p.m. on November 3, 1994, Detective Nickerson met with Elking, who provided a detailed account of the shooting. (Ex. 6 at 9).

Elking viewed photographs Detective Nickerson brought to the meeting. Detective Nickerson stated in his report that Elking identified Plaintiff. Elking, on

the other hand, recanted his testimony via a 2003 affidavit and 2024 deposition testimony and avers that he did not identify Plaintiff.

On November 3, 1994 at approximately 5:45 p.m., Detectives Clyde Bailey and Gary Stittum of the Homicide Section observed a vehicle being operated by Plaintiff, traveling north on Grand Avenue, at approximately 3200 South Grand. Plaintiff was accompanied by Phillip Campbell. (Ex. 6 at 12). Detectives Bailey and Stittum curbed the vehicle in front of 3150 South Grand. Plaintiff and Campbell were directed out of the vehicle. Plaintiff was advised by Detective Bailey of the ongoing investigation relative to the fatal shooting of Markus Boyd, and that he was a suspect in the shooting. Detective Nickerson's report states that Plaintiff and Campbell were given their Miranda rights at that time.

At approximately 6:15 p.m. on November 3, 1994, Detective Nickerson entered Interview Room No. 2 and informed Plaintiff that he was a suspect in the fatal shooting of Markus Boyd. (Ex. 6 at 14). Plaintiff was advised of his rights and stated he understood. Plaintiff then stated to Detective Nickerson, "Man, that boy was my friend, I didn't shoot him. I was with my girlfriend on Lafayette when that happened." (*Id.*) Plaintiff continued to deny involvement in the incident and stated he knew of no one who would want to kill Boyd. Plaintiff stated he would voluntarily participate in a lineup because no one could or would pick him out. (*Id.*)

Assistant Circuit Attorney Dwight Warren independently investigated the alibi. (Ex. 13 at 74; 145:24-146:2).

That same evening, at approximately 6:30 p.m., Detective Nickerson entered Interview Room No. 1, which was occupied by Phillip Campbell. Campbell, was advised that he was going to be questioned relative to the fatal shooting of Markus Boyd and was informed of his rights and stated he understood. Campbell stated he did not have any knowledge of the shooting and would cooperate in any way. Campell agreed to voluntarily participate in a lineup, stating, "no one could identify him as being there or taking part." (Ex. 6 at 14-15).

At approximately 7:50 p.m. on November 3, 1994, Detective Ralph Campbell of the Homicide Section reported for his tour of duty. (Ex. 6 at 15). Detective Campbell was advised by Detective Nickerson that Lamar Johnson was present in Interview Room No. 2 and was a suspect in the fatal shooting of Markus Boyd. (*Id.*) Detective Campbell requested to interview Plaintiff about an unrelated matter. According to Detective Nickerson's police report, during this interview, Plaintiff stated, "I shouldn't have let the white guy live." When Detective Campbell asked what Plaintiff was talking about, Plaintiff stated, "Man there's a witness. I should have never let the white guy live." According to the report, Plaintiff continued: "Man Markus and I used to be friends, now I'm fucked why did I let the white guy live." (Ex. 6 at 16) When Detective Campbell asked if

Plaintiff wanted to make a statement to detective on Markus Boyd's homicide, he replied, "No, we're fucked, I let the white guy live." (*Id.*) Detective Nickerson was not present in the room when this statement was made. Campbell relayed the statement to Nickerson afterward. (Ex. 12 at 344:14-345:5).

In a 2002 letter, Johnson wrote: "Did Campbell even ask me why I let the white guy live? The more I think about it, the more I realize he probably did." (Deposition Transcript of Lamar Johnson, Vol. I, Ex. 14, at 53:5-10). At his April 2026 deposition, Plaintiff acknowledged it and further stated that Detective Campbell said to him, "I'm surprised that you let the white guy, you didn't kill the witness in the case." (*Id*. at 53-55). Johnson testified that he responded: "Yeah, that should tell you I didn't do this." (Id.)

After 9:00 p.m. on November 3, 1994, Detective Nickerson picked up Elking to view lineups. According to Detective Nickerson's police report, Elking was "visibly shaken and extremely nervous." (Ex. 6 at 16). The first of two lineups was held at 9:56 p.m. The lineup consisted of Lamar Johnson and three other individuals chosen from the second-floor holdover. Lamar Johnson was placed in position number 3 after choosing his own position. (Ex. 6 at 17). Detectives Bailey, Stittum, and Nickerson were all present during the lineups. The report states that it was apparent to Detective Nickerson that Elking was scared and uncertain his identity was being concealed by the two-way mirror. Elking asked several times if

anyone could see him behind the mirror and was assured no one could. (Ex. 6 at 17-18). On first viewing the lineup, Elking became nervous and unsure of what to do and asked to leave the area two times. After the second time, Elking asked Detective Nickerson if the subjects could state the words, "Get the fuck up" – the same words stated by the subject who had grabbed Elking by the arm during the shooting. All subjects stated the words. (Ex. 6 at 18). Elking stated that the subject in position number 4 (Donald Shaw, a non-suspect filler) was the person who grabbed him by the arm and also shot Boyd with a revolver. Detective Nickerson documented that Elking picked a filler in the first lineup in his police report. (Ex. 6 at 18).

At 10:18 p.m., a second lineup was conducted, consisting of Phillip Campbell in position number 4 and three other individuals chosen from the second-floor holdover. Campbell was allowed to choose his own position. Elking viewed the lineup for nearly a minute without making any identification. After each participant repeated the words, "Get the fuck up," Elking stated that no one in the lineup looked familiar. Detective Nickerson documented in his police report that Elking picked no one in the second lineup. (Ex. 6 at 18).

According to Detective Nickerson's report, after both lineups were completed, while Detective Nickerson was escorting Elking back to the fourth-floor office, Elking stated, "You guys know I lied, I don't know how you could tell

but you all knew I was lying when I picked the wrong guy." Elking then stated, "The guys that shot Markus were #3 in the first lineup and #4 in the second lineup. I could tell for sure it was #3 in the first lineup when I seen his lazy left eye. I knew it was #4 in the second lineup when I seen the scar over his right eye." Elking also told Detective Nickerson, "Detective, today when you showed me the group of photographs, I was positive that the one I picked out was one of the guys, but I was scared, I didn't want to tell you I was positive at that time because I wanted time to think. I have to think of my family you know." Elking stated he was sorry for lying and was prepared to proceed with whatever was necessary to charge the two individuals that killed Boyd. (Ex. 6 at 18-19).

At trial, Elking testified under oath that "[n]obody" told him who to pick out, that the police were not "intimidating [him] to pick out anybody," and that his reluctance stemmed from fear of the individuals in the lineup, not from police pressure: "I didn't feel as intimidated as when I was standing down looking at the lineup. […] I just felt down there that intimidated from the people in the lineup is what I was feelin' intimidated by." (1995 Criminal Trial Transcripts, Ex. 15b, at 171). Elking repeated this denial in his 1995 pretrial deposition, confirming that Nickerson "did not tell me who it was or anything like that." (Ex. 9 at 34).

In the 2003 letter to Reverend Rice, Elking stated that detectives and the prosecutor convinced him after the lineup to identify Plaintiff. (Elking 2003 Letter

to Reverend Rice, Ex. 16). In the 2003 letter to Plaintiff, he stated "Dwight Warren & Det. Joe Nickerson both in so many words threatened me & coerced me." (Elking 2003 Letter to Lamar Johnson, Ex. 17, at 1). In the 2010 affidavit, he described an elevator conversation, and in 2019, he stated that "everything I ever told about the murder is true except for the part of me picking three and four out of the line-up." (Elking 2010 Affidavit, Ex. 18, 5-6; 2019 Deposition Transcript of Greg Elking, Ex. 19, at 124). In his 2003 letter to Reverend Rice, Elking did not mention an elevator conversation. (Ex. 11 at 155:3-5).

In his 2019 deposition, Elking testified that he was "looking into the guy's eyes that was down—that—that pulled the gun on me" during the shooting, and that when he first viewed Johnson's photograph, the photo looked familiar "because of the eyes." (Ex. 19 at 50, 77).

At his 2024 deposition, Elking described an elevator scenario in which Nickerson, after appearing "disappointed" that Elking had failed to identify anyone during the lineups, said to him: "You know who they were." (Ex. 11 at 173:17-175:6). According to Elking, he then told Nickerson: "Well, why don't you tell me the numbers of the guys and I'll tell you if that's the numbers I was gonna pick." (*Id*. at 174:22-24). Elking testified that Nickerson then provided the lineup position numbers and Elking agreed. (*Id*. at 171:8-11: 172:5-8). Elking testified that during the lineup itself, Detective Nickerson did not tell him he "ha[d] to pick someone

out of this lineup." (*Id*. at 173:4-8). Elking testified that he never told Nickerson that the individuals in the lineup were not the people who committed the murder of Marcus Boyd: "No. I never said nothing like that." (*Id*. at 182:21-183:5). Elking testified that he never identified anyone during the formal lineup procedures themselves; his identification came only afterward, where he stated he volunteered it in what he described as an effort to avoid disappointing Nickerson. (*Id*. at 171, 174). Elking wrote and swore that Nickerson provided the lineup position numbers without Elking asking for them and without Elking "agree[ing]." See P131.

Although Elking testified that Nickerson did not tell him he had to pick someone out, Elking also testified that Nickerson had promised him money if he did pick someone out, and Nickerson's disappointment at Elking's failure to identify Nickerson's suspects made Elking worried he would not receive that payment. See P128–29.

Detective Stittum testified at his deposition that his involvement in the Boyd investigation was minimal: "I had very little—very little to do with this." (Deposition Transcript of Gary Stittum, Ex. 20, at 27:24-28:2). Stittum confirmed that his only role on November 3, 1994 was being assembled the morning of Johnson's arrest to help locate Johnson; he did not participate in any witness interview, did not review Nickerson's report, and testified the investigation was "Nickerson's investigation, not [his]." (Ex. 20 at 29:2-5, 41:5-42:24, 119:16-22;

219:14-220:21). According to the lineup forms, Detective Bailey was the officer inside the lineup room with the participants, while Detectives Nickerson and Stittum were outside the room with the witness. (Lineup Forms, Ex. 21). At his 2024 deposition, Elking testified that the "black detective" who pressured him was Detective Jackson, though he was "not 100 percent certain."

A search of Johnson's vehicle also yielded dark blue sweatpants and black nylon jacket with red sleeves.

Both Johnson and Campbell were informed that they had been identified by a witness as being responsible for the fatal shooting of Markus Boyd. Both declined to make any further statement to Detective Nickerson. (Ex. 6 at 14).

The following day, on November 4, 1994 at 9:10 a.m., Detective Nickerson conveyed Elking to the Circuit Attorney's Office, where Elking and Detective Nickerson met with Assistant Circuit Attorney ("ACA") Warren. There, ACA Warren interviewed the witness and reviewed the circumstances of the arrest as prepared by Detective Nickerson. After doing so, ACA Warren issued warrants charging Lamar Johnson and Phillip Campbell with Murder First Degree and Armed Criminal Action. (Ex. 6 at 19-20).

Warren further testified that he "prosecuted [Johnson] because of the Mock statement" and "because of Elking's statement"—evidence he independently

evaluated. (Ex. 13 at 56:19-57:4; 98:19-99:1; 235:22-236:5, 263:12-16, 61:17-62:3).

The decision to initiate criminal proceedings against Plaintiff was made solely by ACA Warren. (Ex. 13 at 53:20-54:7, 263:22-264:1). Warren testified that he came to the determination that Lamar Johnson should be prosecuted for the murder of Marcus Boyd after reviewing the evidence and speaking with witnesses. (*Id*. at 263:12-16).

The Victim/Witness Relocation Program was established in September of 1993 with $25,000.00 in asset forfeiture funds. (Victim/Witness Protection Fund Record (VS-Subpoena 00059808), Ex. 24, at 2; see also, e.g., Victim/Witness Protection Fund Record (VS-Subpoena 00011915), Ex. 25). The Memorandum of Understanding governing the asset forfeiture funds was an agreement between the Circuit Attorney and the Board of Police Commissioners. The City of St. Louis was not a party. (Ex. 3 at 240:10-19; Memorandum of Understanding dated October 20, 1993; Ex. 26).

On November 4, 1994, the Circuit Attorney's Victim Services Unit issued an initial payment of $250.00 to Elking through the Victim/Witness Protection Fund... Subsequent payments for Elking included utilities ($227.99 on November 9, 1994), moving expenses ($392.50 on November 22, 1994), and storage ($105.00 on

November 22, 1994). (Victim Services Payment Records to Elking (VS-Subpoena 00059830-00059837, 59863-59869), Ex. 27).

All payments were processed through the Circuit Attorney's Victim Services using Board of Police Commissioners' forfeiture funds. (Ex. 27 at VS-Subpoena 00059834, 00059863).

The funds used for the relocation of Elking and his family "were funds that were supplied from asset forfeiture funds in the hands of the Board of Police Commissioners, and not the city of St. Louis." (Ex. 3 at 234:17-21). None of the funding identified as supporting Elking or his family were City-administered funds, and no City agency played any role in those expenditures. (Ex. 3 at 27:8-23; 234:13-21). Roth confirmed that the City did not administer witness protection programs using SLMPD and/or board provided funds. (Ex. 3 at 239-241:4). Kim Norman, the former Executive Director of Victim Services, testified that payments to witnesses were initiated by the lead prosecutor, not by City officials, and that she would not have made payments to the Elkings without having some sort of guidance by Dwight Warren, the Assistant Circuit Attorney assigned to the case. (Deposition Transcript of Kimberly Norman, Ex. 28, 150:18-24).

Norman testified that Victim Services operated under the Circuit Attorney's Office, not the City. (Ex. 28 at 150:18-24). Norman testified that she had no independent recollection of the Elking payments and that it was "very rudimentary

accounting back in that day[.]" (Ex. 28 at 91:22-92:16). Regarding the records of financial payments made to Elking, Norman testified that she did not recall ever being asked to turn over those documents to a lead prosecutor. (Ex. 28 at 122:6-8). Norman testified that she had no recollection of any Individual Defendant ever coming to the Victim Services Unit to request financial assistance for a witness. (Ex. 28 at 125:2-127:10). The decision to compensate Elking was made by the Circuit Attorney's Office. (Ex. 13 at 19:19:20:2, 244:21-245:3; 1989 Grant Application, as Ex. 29, at VS-Subpoena 00046916). Nickerson took Elking to the Victim Services Unit, but had no knowledge whether Elking received payment. (Ex. 8 at 294-298).

ACA Warren testified that he disclosed what he knew about Elking's relocation to defense counsel: "whatever I knew about the relocation, I disclosed to David." (Ex. 13 at 245:10-13). Johnson's criminal defense attorney David Bruns confirmed at his deposition that he was aware of Elking's relocation. (Ex. 10 at 79:19-81:22).

Elking himself testified that the financial assistance he received was provided through a "witness protection program" and that "no one explicitly said to him that those payments were for his testimony. (Ex. 11 at 210:24-211:14). Elking described the assistance as help with relocation, back utilities, and living

expenses. (Id. at 134:3-17). Elking could not recall the precise amounts he received, testifying only that the initial payment was "over a couple hundred dollars" and that he did "not today" remember the exact amount. (Id. at 133:19-25).

The City had no control over the policies, procedures, rules, regulations or practices concerning Victim Services operations in the Circuit Attorney's Office, and no "authority to alter, amend or modify Circuit Attorney policies … concerning the maintenance of records documenting financial assistance provided by the Circuit Attorney's Office." (Ex. 3 at 234:23-235:13, 241:13-21). Edward Roth, the City's corporate designee, testified that the City "would have no knowledge" of the operational details of Victim Services, and that the City's lack of involvement was not merely due to the passage of time but rather that "it wasn't their business directly under state law and charter authority." (Ex. 3 at 50:21-51:2, 106:11-18, 1654:8-165:).

No witness in this case has testified that the City directed, authorized, or had knowledge of the specific payments to Elking or of any policy concerning the maintenance or disclosure of such records.

No witness has identified any City official who was aware of how the Circuit Attorney's Office maintained its Victim Services records or how (or

whether) those records were disclosed to defense counsel. (Ex. 3 at 106:2-18, 165:1-165:3).

In early November 1994, William Phillip Mock, a 37-year-old white male, was confined in the second-floor holdover. Mock had been arrested by SLMPD officers on November 2, 1994 on a capias warrant for a probation violation. (1994-11-06 Inter-Department Report re William Mock Dated November 6, 1994, Ex. 30; William Mock Violation Report, Ex. 31; 1995 Deposition Transcript of William Mock, Ex. 32, at 6:24-7:6). Mock was assigned to cell number 10 on the second-floor holdover. He believed he was moved to cell 10 on approximately November 5, 1994, and estimated that he remained there for about two days. (Ex. 30; Ex. 32 at 8:3-10:4).

Mock testified that on Saturday, November 5, 1994, Mock was alone in cell 10 lying in his bunk when he overheard conversations between individuals in neighboring cells who were shouting loudly to one another. (Ex. 32 at 10:12-12:4, Ex. 15c at 245:22-246:3). The voices were coming from cells to Mock's right, which he estimated to be approximately 20 to 30 feet away. Mock heard an individual identified as "Lamar" speaking with another individual identified as "Lamont"; the two addressed each other by name as they shouted back and forth. (Ex. 32 at 11:3-5, 13:23-14:3; Ex. 15c at 245:22-247:6). According to Mock, Lamont asked Lamar whether the police had enough to hold them, and Lamar

responded that “they didn’t have the gun, they weren’t asking the right questions, they didn’t have the white boy, they didn’t have shit.” (Ex. 15c at 247:10-14). Mock further reported that Lamar told Lamont to get a hold of a guy named Terrell and get the gun, specifically directing Lamont to go to an address on Folsom to find Terrell and obtain a chrome gun. (Ex. 32 at 13:7-18). Lamont then asked about the location of another firearm, and Lamar replied that “B.A. and Easy got the other gun, they’re down in the hood, find them and get that gun from them.” (Id.) Lamar also instructed Lamont to “take care of the white boy,” stating that “the white boy must be snitching.” (Ex. 15c at 247:15-18). Additionally, Lamar told Lamont to contact his mother and tell the police that he was with his family “when this went down.” (Id. at 247:19-22). The conversations stopped and started over a period of approximately three to four hours. (Ex. 32 at 14:14-19). Mock had no prior knowledge of the case; had never met Lamar Johnson, Phillip Campbell, or anyone named Lamont; and had no prior connection to the case (Ex. 32 at 7:20-8:2, 10:5-11; Ex. 15c at 248:19-25). Mock received no promises in exchange for his cooperation. (Ex. 32 at 23:5-20; Ex. 15c at 249:17-19). ACA Warren wrote a letter on Mock’s behalf to the Board of Probation and Parole and he testified he may have told Mock he would call the governor on his behalf. Ex. 17 (Warren Dep.) at 195–96, 199.

After overhearing the conversations, Mock voluntarily requested to speak with a detective from the Homicide Division. Approximately one hour later, on November 5, 1994, Detective Ronald Jackson of the Homicide Section responded to the second-floor holdover and met with Mock (Ex. 32 at 15:10-17:6; Ex. 15c at 247:23-248:3). No one from law enforcement had previously asked Mock to monitor or pay attention to any holdover prisoners' conversations. (Ex. 15c at 248:15-18). Detective Jackson escorted Mock from his cell to the Homicide Division offices, where Mock was handcuffed to a table in an interview room. (Ex. 15c at 248:6-10). Mock relayed to Detective Jackson the substance of the conversations he had overheard. (Ex. 32 at 11-14, 18:10-13; Ex. 15c at 245:22-247:22). Detective Jackson then thanked Mock for his cooperation and asked that if Mock heard anything further, he should let him know. (Ex. 32 at 22:21-23:2). Mock was then returned to cell 10 on the second-floor holdover. (Ex. 32 at 23:21-23).

At no time did Detective Jackson provide Mock with any details about the cause under investigation, nor did anyone else disclose case information to Mock. (Ex. 15c at 248:1-25). No promises were made to Mock by Detective Jackson or any other member of the police department in exchange for his cooperation. (Ex. 32 at 23:5-20).

On the morning of Sunday, November 6, 1994, Mock overheard further conversations between prisoners on the second-floor holdover. (Ex. 32 at 24:9-25:12). During this second round of conversations, Mock heard a person who identified himself as "Phillip" speaking with Lamar. (Ex. 32 at 24:9-25:22). According to Mock, Phillip asked Lamar whether the police had enough to convict them. (*Id.*) Lamar responded that the police "don't have the gun, they don't have Terrell and they don't have the white boy, and as long as the white boy ain't snitching, we're cool." (Ex. 30; Ex. 32 at 25:2-12). Mock further reported that Phillip stated to Lamar, "What if they get Terrell or the white boy? What if they get Terrell with the gun and they lean on him? He'll snitch on us about the robbery we did on the south side and the white boy you shot." (Ex. 30 at 2; Ex. 15c at 261). Phillip then said, "You didn't have to kill him, did you" to which Lamar replied, "Man, he wouldn't give up his shit." Lamar told Phillip to "shut up and stop whining." (*Id.*) Lamar then yelled down the cells to Lamont: "Man, you got to get a hold of Terrell, get the gun and take care of that white boy." (Id.; Ex. 15c at 247:15-18).

Following the Sunday morning conversations, Mock again contacted the Homicide Division, requesting to speak with a detective. (Ex. 32 at 26:22-28:5). Detective Jackson then returned to the holdover and escorted Mock to the Homicide Division offices. (*Id.*) Mock relayed the substance of the additional

conversations he had overheard on the morning of November 6, 1994 to Detective Jackson. (Ex. 30 at 2; Ex. 32 at 28:6-23). Detective Jackson asked Mock if he would reiterate both the statement he had made on Saturday, November 5, and the statement he had just given, for the purpose of placing these statements on an audio cassette tape. (Ex. 32 at 29:1-8). Mock agreed and provided a taped statement, which was recorded by Detective Jackson. Detective Jeffrey Crawford of the Homicide Section was present for Mock's taped statement. (Ex. 15c at 261:14-16; Ex. 30 at 2; Ex. 22 at 58:6-59:11). The tape was marked as evidence and retained in the Homicide Office tape file. (Ex. 6 at 20-21).

Crawford's only involvement in the Boyd homicide investigation was him sitting in on Mock's audiotaped statement. Crawford testified that this interview was "the sum total of [his] activity in the case" and that he was "not aware of any other documented police work by [him] aside from what's in" the memo drafted by Detective Jackson. (Ex. 22 at 58:6-59:11, 60:22-61:4). Plaintiff testified that he was not entirely sure what Crawford fabricated. (Ex. 14 at 183-84, 200-201).

The following morning, Monday, November 7, 1994, Detective Nickerson, who had been contacted by Detective Jackson on Sunday afternoon regarding Mock's information, responded to the second-floor holdover and escorted Mock to the Homicide Section offices. (Ex. 6 at 21-22). Mock was asked if he would repeat the statements he made to Detective Jackson, and he agreed to do so, repeating the

information he had previously provided. Immediately thereafter, Detective Nickerson contacted ACA Warren and advised him of the information given by Mock. (*Id.*)

Mock has never recanted his audiotaped statement given to police. Detectives Jackson, Crawford, and Nickerson all denied supplying Mock with information. (Deposition Transcript of Ronald Jackson, Vol. I, Ex. 33, at 161:14-162:2; Ex. 22 at 70:6-74:1, 156; Ex. 12 at 54:7-13). Nickerson denied having any knowledge at the time of the investigation that Mock had provided information in another case or that he had mental health or substance abuse issues. (Ex. 12 at 116:20-117:11, 340:2-9). In 1995 Mock wrote a letter stating that he gave his incriminating testimony in exchange for promises. (Plaintiff Ex. 43). Mock is now deceased.

On December 6, 1994, an indictment was filed against Lamar Johnson in the Circuit Court of the City of St. Louis, charging him with Murder in the First Degree, § 565.020, RSMo 1994, and Armed Criminal Action, § 571.015, RSMo 1994, for the shooting death of Marckus Boyd. Plaintiff was also charged as a prior and persistent offender pursuant to §§ 558.016 and 557.036.4. (Indictment and Warrant on Indictment, as Ex. 34). The case was assigned Cause Numbers 941-3706A for Lamar Johnson. (Ex. 15a-d). Lamar Johnson's criminal defense attorney, Assistant Public Defender David Bruns, filed various pre-trial motions, including a

motion to suppress statements and a motion to suppress identification. (Ex. 15a at 1-20). ACA Warren confirmed he provided all required disclosures to the criminal defense attorney. (Ex. 13 at 257:11-23).

On June 21, 1995, Mr. Bruns conducted depositions of several witnesses, including Dawn Byrd, Leslie Williams, Edward Neiger, and the Secret Witness Greg Elking. (Ex. 10 at 41-43). ACA Warren appeared for the State at each deposition, and Robert Lundt appeared for Phillip Campbell. (Ex. 10 at 75, 105-106). Bruns also deposed William Mock prior to trial and had the opportunity to investigate Mock's background at that time. (Ex. 10 at 43-45, 100-109). Bruns confirmed at his deposition that he had the ability to interview and depose Elking prior to trial and did in fact do so. (Ex. 10 at 15-18, 43-45, 72-73). Bruns confirmed that neither Dawn Byrd, Kristine Herrman, nor Ed Neiger testified at Johnson's criminal trial. (Ex. 10 at 183-84). Bruns testified that he could not have obtained Mock's medical and psychiatric records. Bruns Dep. Ex. 66 at 109–110.) Mock lied during the deposition about his mental health history, criminal record, and prior testimony as a witness in a criminal trial. (Bruns Aff. Ex. 57 at 2.)

Plaintiff's trial was held on July 10 through July 12, 1995, before the Honorable Booker Shaw, Judge of Division No. 12 of the Circuit Court of the City of St. Louis. At trial, ACA Warren appeared for the State and Mr. Bruns represented Johnson. (Ex. 15a-d).

On July 10, 1995, outside the presence of the jury, the court heard a motion to suppress statements. Detective Campbell testified at this hearing about his interview with Plaintiff, and the incriminating statements he made regarding "the white guy." (Ex. 15a at 1-10).

The State called ten witnesses at trial, and one witness in rebuttal. The State's witnesses included: James Gregory Elknig, Detective David Ury, Detective Clyde Bailey, Dr. Michael Graham (forensic pathologist), Leslie Williams, Detective Ralph Campbell, Detective Ronald Jackson, William Mock, Steven DeBisschop, and Ronald Jackson. In rebuttal, the State called Detective Nickerson. The State did not call Dawn Byrd, Christine Herrman, or Ed Neiger. (Ex. 15b at 156-308, Ex. 15d at 333-336).

At trial, Elking testified as the State's key witness, identifying Lamar Johnson as one of the shooters, basing his identification primarily on a "lazy eye" that he said he observed through the mask opening. Elking testified that the mask covered all but the eyes of the assailant. (Ex. 15b at 159:9-161:8). Elking testified that he had an opportunity to observe the assailant's face through the mask opening for two to three minutes at close range while the assailant stood directly in front of him. (Id. 159-60, 184:13-15). Elking described the assailant's height and build in terms consistent with Johnson's physical characteristics. (Id. at 185-86, 191).

Elking testified that he was "positive" in his identification based on the assailant's "lazy eye" as well as the assailant's height and build. (Ex. 15b at 160, 191).

Elking further testified that no one told him who to pick out and that the police were not intimidating him to pick out anybody. (Ex. 15b at 171:3-17). Elking identified Plaintiff in court, basing his identification on the "lazy eye" he observed through the mask opening. (Ex. 15b at 159:9-161:8).

Elking has subsequently admitted under oath and under penalty of perjury that his incrimination of Plaintiff was false and was manufactured by Defendants. P48, 54, 58, 99–100, 111, 113, 128–31, 175, 395.

No police report was ever entered into evidence at trial. (Ex. 15a-d). Leslie Williams testified at trial about observing the shooting from the stairway. Regarding Plaintiff, Williams testified that "his eye is lazy, it is like the whole side of his face is kind of slanted. His whole face is slanted." (Ex. 15c at 219-222, 223:18-20).

Detective Campbell testified at trial about the statements Plaintiff made during his interview on November 3, 1994 regarding "the white guy." (Ex. 15c at 226-229).

William Mock testified at trial about conversations he overheard between prisoners in the second-floor holdover as stated supra. Mr. Bruns argued in his

opening statement that the jury would find that William Mock's testimony was unreliable, that it was impossible for Mock to have heard a conversation from his cell location, and that Plaintiff never made any statements to Detective Campbell. (Ex. 15b at 155-156).

Defense attorney Bruns presented one witness at trial: Plaintiff's girlfriend at the time, Erika Barrow, who was Plaintiff's alibi witness. (Ex. 15d at 309-330). Bruns chose not to call two additional alibi witnesses. (Ex. 10 at 110:23-112:2; Ex. 14 at 176:9-178:1).

At the close of the State's case and the defense's case, defense counsel moved for a judgment of acquittal, arguing the State had not provided sufficient evidence to convict. The motion was denied. (Ex. 15d at 308, 332-333).

In rebuttal, the State called Detective Nickerson. Nickerson testified that Plaintiff could have committed Boyd's murder during the brief period he left his residence because it would take less than five minutes to travel from Johnson's home to Boyd's home. (Ex. 15d at 333-334). Detective Nickerson also testified he drove the distance from Johnson's house to Boyd's house to confirm the possibility of Plaintiff committing the murder. (Id.)

On July 12, 1995, the jury convicted Lamar Johnson on both counts of Murder First Degree and Armed Criminal Action. (1995 Sentencing Transcript, attached hereto as Ex. 35, at 2). The court found Johnson to be a prior and

persistent offender based on two prior felony convictions: Tampering in the First Degree (June 11, 1991) and Illegal Possession of a Controlled Substance – Cocaine (June 15, 1992). (Ex. 15b at 143).

On May 7, 1996, Phillip Campbell pleaded guilty to Boyd's homicide. During his plea, Campbell affirmed under oath that he, "acting together with Lamar Johnson, caused the death of Markus Boyd by shooting him…" (Phillip Campbell Plea Transcript, Ex. 36, at 6-8). Campbell subsequently signed affidavits in 1996 and 2009, and James Howard signed affidavits in 2002, 2005, and 2009, each stating under oath that they killed Boyd and that Plaintiff was not involved. (Affidavits of Phillip Campbell and James Howard, Ex. 37). Campbell has not filed any subsequent sworn statement reconciling his plea hearing testimony with his later affidavits.

On July 28, 1995, before sentencing, Plaintiff wrote a letter to Judge Shaw stating that "a few days after my conviction I received several notes and letters from my co-defendant Phillip Campbell. In these letters Phillip admits his involvement and identifies a second individual who was not charged." (Suggestions in Support of Petition for Writ of Habeas Corpus, Ex. 38, at 49).

On August 4, 1995, Mr. Bruns filed a Motion for New Trial and a Motion for Evidentiary Hearing to Determine if Newly Discovered Evidence Necessitates a New Trial. The Motion for New Trial raised nine grounds, including claims of trial

error in admitting evidence of a mask, a Fourth Amendment violation, the exclusion of hearsay testimony regarding Plaintiff's alibi, and a request for an evidentiary hearing based on evidence that "Phillip Campbell and another, not Lamar Johnson, committed the murder of Marcus Boyd." (Ex. 35 at 3-10; Ex. 38 at 50).

On September 14, 1995, at the request of ACA Warren, detectives executed a search warrant at the St. Louis City Jail to locate and seize correspondence between Phillip Campbell and Lamar Johnson. (Ex. 38 at 50-51; Ex. 35 at 3-10). Letters were found and seized from Lamar Johnson's cell. (*Id*). The State objected to consideration of the letters as part of Johnon's new trial motion on procedural grounds, and the trial court denied Plaintiff's request for a new trial. The trial court then proceeded with sentencing. (Ex. 35 at 3-10).

On September 29, 1995, after denying the Motion for New Trial and the Motion for Evidentiary Hearing, Judge Shaw sentenced Johnson to life imprisonment without probation or parole on Count I (Murder in the First Degree) and life imprisonment on Count II (Armed Criminal Action), to run concurrently. Plaintiff was found to be a prior offender. (Ex. 35 at 10-13). Following the imposition of his sentence, the court inquired whether Johnson had any complaints about the advice and assistance provided by Mr. Bruns during the trial. Plaintiff raised three specific concerns, one of which concerned the conversations Mock

overheard in the second-floor holdovers on November 5-6, 1994. Plaintiff told the court that only part of the conversation Mock relayed to detectives was not true, and that Cortez Snipes was willing to testify to this. (Ex. 35 at 16). When asked by the court what Mr. Snipes's testimony would have consisted of, Plaintiff stated, "That I was merely jus telling' Phillip information I had learned from both the police officers and Leslie Williams, that it was a white guy involved and that the subject supposedly wore the same mask that was found in my car two months before this incident." (*Id.*)

On February 7, 1996, Johnson filed a pro se Motion to Vacate, Set Aside or Correct the Judgment or Sentence pursuant to Rule 29.15. On February 14, 1996, attorneys N. Scott Rosenblum and Ramona L. Marten entered their appearances on Plaintiff's behalf. On April 8, 1996, they filed a First Amended Motion to Vacate, Set Aside, or Correct the Judgment or sentence and Request for Evidentiary Hearing. The amended motion raised claims of ineffective assistance of counsel, including failure to call witnesses, failure to present evidence regarding a mask, and failure to investigate the case. (Rule 29.15 Legal File, attached hereto as Ex. 39, at NKDEFS – 033598 - 033616).

On August 28, 1996, the motion court granted a hearing on Claims 1, 3, 4, 5, and 8 of the First Amended Motion. (Ex. 39 at NK DEFS – 033617).

On October 28, 1996, before the Rule 29.15 hearing, a second Motion for New Trial based on newly discovered evidence and prosecutorial misconduct was filed in both the trial court and the Missouri Court of Appeals, Eastern Division, while Johnson's direct appeal was pending. The motion alleged that the prosecution had failed to disclose impeachment evidence relating to William Mock's prior convictions, and attached an affidavit signed by Phillip Campbell stating that Plaintiff was not involved in Boyd's death. The Court of Appeals denied the motion for new trial and evidentiary hearing without opinion. (Ex. 38 at 53-54).

On December 6, 1996, the Rule 29.15 evidentiary hearing was held before the Honorable Booker Shaw. Ramona Marten appeared for the movant, Lamar Johnson, and Assistant Circuit Attorney Edward Sweeney appeared for the State. Witnesses at the hearing included Detective Joseph Nickerson and Lamar Johnson. David Bruns, Johnson's trial attorney, also testified. (Rule 29.15 Evidentiary Hearing Transcript, Ex. 40).

At the evidentiary hearing, Plaintiff testified that he told Mr. Bruns that he wanted to testify at trial, but that Mr. Bruns advised against it because Bruns did not want to bring out that Plaintiff sold drugs and had prior convictions. Plaintiff testified he disagreed with Bruns's advice, believing he could have testified about

his alibi and denied the incriminating statements attributed to him by Detective Campbell. (Ex. 40 at 26-47).

Mr. Bruns testified at the evidentiary hearing that Plaintiff had told him he wanted to testify during the first part of the trial during the State's case but that, after the State's evidence concluded, Plaintiff did not reiterate his desire to testify. (Ex. 40 at 47-53).

On April 23, 1997, the motion court denied all claims in the Rule 29.15 motion. The trial court also denied the separate Motion for New Trial based on newly discovered evidence on April 23, 1997. (Ex. 39 at NK DEFS – 033629 - 033630).

In 1997, Plaintiff appealed both the judgment of conviction and the denial of his Rule 29.15 Motion. (Ex. 39 at NK DEFS - 033641).On April 6, 1999, the Missouri Court of Appeals, Eastern District, issued an Order Per Curiam affirming both the judgment of conviction and the judgment denying post-conviction relief. (Mo. Ct. of App. Order Dated April 6, 1999, Ex. 41).

In March 2000, Johnson filed a pro se petition for a writ of habeas corpus raising five grounds for relief: (1) improper admission of the mask seized from Johnson's car; (2) ineffective assistance of counsel for waiving an objection to Mock's testimony; (3) the trial court's failure to declare a mistrial sua sponte; (4) improper exclusion of testimony denying participation in the murder; and (5) the

trial court's failure to grant a new trial or evidentiary hearing based on newly discovered evidence. (Ex. 38 at 56-57).

On January 22, 2003, United States Magistrate Judge Medler issued a Report and Recommendation recommending that the petition be denied on all grounds and that a certificate of appealability not issue. On March 24, 2003, the undersigned adopted and sustained the Report and Recommendation, denied the petition for writ of habeas corpus, and declined to issue a certificate of appealability, finding that Plaintiff had not made "a substantial showing of the denial of a constitutional right. (Report & Recommendation of United States Magistrate Judgment Dated Jan. 22, 2003, Ex. 42; March 24, 2003 Judgment, Ex. 43).

Plaintiff subsequently filed a Motion to Alter or Amend Judgment and a Motion for Relief from Judgment, each of which were denied. He also filed a Notice of Appeal. On September 16, 2003, the Eight Circuit Court of Appeals denied Plaintiff's application for a certificate of appealability and dismissed the appeal. (Motion for Certificate of Appealability on Petitioner's Rule 60b Motion and Court's Order, as Ex. 44; Judgment on Application for a Certificate of Appealability, attached hereto as Ex. 45).

In September 2004, Johnson filed an amended pro se petition for writ of habeas corpus in the Circuit Court of Mississippi County, alleging actual innocence based on letters and affidavits from the alleged perpetrators, Phillip Campbell and

James Howard, and raising five constitutional claims. The petition was denied without prejudice in June 2004. (Sept. 2004 Amended Petition for Writ of Habeas Corpus, Ex. 46; Lamar Johnson v. Chuck Dwyer, 04CV745399, Docket Sheet, Ex. 47).

In October 2004, Johnson filed a second pro se petition for writ of habeas corpus in the Circuit Court of Mississippi County, once more alleging actual innocence and asserting the same five constitutional claims. On December 15, 2004, the Circuit Court of Mississippi County denied Johnson's petition for writ of habeas corpus with prejudice. (Oct. 2004 Petition for Writ of Habeas Corpus, Ex. 48; Judgment and Order Denying Petition, Ex. 49).

On January 11, 2005, Plaintiff filed a petition for writ of habeas corpus in the Missouri Court of Appeals, Southern District, raising the same claims. The Court of Appeals denied the petition on February 15, 2005. (Jan. 2005 Petition for Writ of Habeas Corpus, Ex. 50; Lamar Johnson v. Chuck Dwyer, SD26750, Docket Sheet, Ex. 51).

On March 14, 2005, Johnson filed a petition for writ of habeas corpus in the Supreme Court of Missouri, raising the same claims and attaching affidavits from Campbell, Howard, and Elking. On May 31, 2005, the Supreme Court denied the petition. (Mar. 2005 Petition for Writ of Habeas Corpus, Ex. 52; Order and

Mandate in re: State ex rel. Lamar Johnson, Petitioner, vs. Chuck Dwyer, Respondent, SC86666; Ex. 53).

St. Louis Circuit Attorney Kim Gardner established the Conviction Integrity Unit ("CIU") in 2017. The CIU began investigating Johnson's conviction in 2018. (Deposition Transcript of Kimberly Gardner, Ex. 54, at 11-12). The CIU issued a report on July 18, 2019, which concluded that newly discovered evidence, including evidence of prosecutorial misconduct and failure to disclose incentivized witness testimony, demonstrated that Johnson was actually innocent. (Report of the Conviction Integrity Unit, Ex. 55, at 43-44). The CIU presented the following errors: (1) the concealment of more than $4,000 in payments to the sole eyewitness; (2) the failure to disclose the complete criminal and informant history of the State's jailhouse informant; (3) the fabrication of false witness accounts during the law enforcement investigation used to provide a motive that did not exist; (4) the failure to conduct a thorough and competent investigation into the facts of the case; (5) the use of improper and unconstitutional police investigation tactics; and, (6) the presentation of false and misleading evidence to the jury and prosecutorial misconduct that further prejudiced Johnson and rendered the result of the trial fundamentally unfair.").

Jeffrey Estes, the former CIU attorney who investigated Johnson's case, testified that he did not interview Victim Services personnel regarding the

payments and relied entirely on an investigator to verify documents. (Deposition Transcript of Jeffrey Estes, Ex. 56, at 19:10-17). Estes could not identify where the payment records originated and did not speak with Dwight Warren about the failure to interview key witnesses regarding these payments. (Id. at 17:1-6, 19:21-24).

On July 19, 2019, the Circuit Attorney filed the "State's Motion for New Trial Based on Newly Discovered Evidence of Innocence, Perjury, and False Testimony" pursuant to Missouri Rule 29.11. The motion asserted four grounds: (1) newly discovered evidence of innocence, including confessions from Phillip Campbell and James Howard; (2) newly discovered evidence of perjury by the sole eyewitness, Greg Elking, who recanted his identification; (3) the State's failure to disclose material exculpatory and impeaching evidence; and (4) the State's knowing presentation of false and perjured testimony. On the same day, Plaintiff's defense attorney Lindsay Runnels filed a motion on behalf of Plaintiff joining in the motion for new trial. (2019 Motion for New Trial, Ex. 57; Order Denying Motion for New Trial, attached hereto as Ex. 58).

At a status conference on August 1, 2019, the court ordered all parties to brief the question of the court's authority to entertain the Motion for New Trial filed approximately twenty-four years after the deadline in Rule 29.11. On August 15, 2019, the Circuit Attorney filed a brief arguing the court had jurisdiction and a

duty to entertain the motion. The Attorney General filed a brief arguing the court lacked jurisdiction. On August 23, 2019, the Circuit Court issued an Order dismissing the motion for new trial, finding that it lacked authority to entertain the motion. The court concluded that Rule 29.11 did not authorize the Circuit Attorney to file such a motion, that the motion was untimely, and that the court's jurisdiction had been exhausted upon sentencing. (Court's Order re State's 2019 Motion for New Trial, Ex. 59, at 1, 15; State's Brief in Support of Court's Authority to Entertain Motion for New Trial, Ex. 60, at 16; Ex. 58).

On September 3, 2019, Plaintiff filed a Notice of Appeal from the circuit court's order of dismissal. The Circuit Attorney also filed a notice of appeal on behalf of the State. On November 14, 2019, the Court of Appeals granted the Attorney General's motion to dismiss the State's notice of appeal (filed by the Circuit Attorney), redesignated the Circuit Attorney as an intervenor, and denied the motion to strike her brief. (2019-11-20 Respondent's Brief, Ex. 61, at 6; 2020-02-10 Intervenor's Substitute Brief, Ex. 62, at 9).

On December 24, 2019, the Missouri Court of Appeals, Eastern District, issued a Per Curiam opinion dismissing the appeal on the ground that the challenged orders were not appealable under statutory law. The court found that there was no statutory right to appeal the orders entered decades after the final judgment. However, the court transferred the case to the Missouri Supreme Court

pursuant to Rule 83.02. On March 2, 2021, the Missouri Supreme Court issued its opinion dismissing the appeal, holding that there is no “authority to appeal the dismissal of a motion for a new trial filed decades after a criminal conviction became final." (2019-12-24 Per Curiam Majority Opinion, Ex. 63; Supreme Court of Missouri Opinion issued March 2, 2021, Ex. 64, at 10).

Following the Supreme Court of Missouri's recognition that no procedural mechanism existed for prosecutors to correct purported wrongful convictions, the Missouri General Assembly enacted R.S. Mo. § 547.031, which permits a prosecuting or circuit attorney to file a motion to vacate or set aside a judgment "at any time" if the prosecutor has information that the convicted person may be innocent or may have been erroneously convicted. (2022-08-31 motion to vacate, Ex. 65, at 9-10).

On August 31, 2022, the Circuit Attorney of the City of St. Louis filed a Motion to Vacate or Set Aside Judgment and Suggestions in Support pursuant to § 547.031, in Case No. 2222-CC09375, in the Circuit Court of the City of St. Louis. The Circuit Attorney appointed special prosecutors to reinvestigate the case. (Ex. 65; Ex. 54 at 37).

There was an evidentiary hearing held before the Honorable David C. Mason over five days from December 12 through December 16, 2022 to hear evidence on the Motion to Vacate or Set Aside Judgment. The Attorney General

appeared as statutory intervenor, and the Circuit Attorney's Office and Plaintiff's counsel presented evidence in support of the motion. (2022 Evidentiary Hearing Transcript, Ex. 66).

On February 14, 2023, Judge Mason vacated Johnson's convictions. On the same date, the Circuit Attorney of the City of St. Louis entered a *nolle prosequi* as to all charges against Plaintiff, stating that the State of Missouri would not initiate retrial proceedings. (2023-02-15 Nolle Prosequi, Ex. 67).

Plaintiff was subsequently released from custody after approximately 28 years of incarceration. (Ex. 1 at ¶ 20).

Plaintiff filed this civil action on January 17, 2024. (Ex. 1 at 53).

Lieutenant Henderson served as the lieutenant commanding the homicide section during the Boyd investigation. (Ex. 20 at 283:13-284:2). Henderson tasked officers with arresting Johnson after ACA Warren approved the wanted based on Elking's identification. (Ex. 6 at 12). The arrest occurred before Mock came forward. Henderson signed Nickerson's report. (Ex. 23 at 42:18-44:6; Ex. 6 at 24). Plaintiff admitted at his deposition that he did not recall having any interactions with Henderson during the investigation and stated: "I don't believe I made a … or I've said that he falsely reported anything. I believe that he was a supervisor over them." (Ex. 14 at 201:24-202:4).

Captain Oldani served as the captain of the Crimes Against Persons Unit, which included the homicide section, during the Boyd investigation. Oldani's role was "mostly administrative," overseeing "the day-to-day operations of the unit" through his sergeants and lieutenants. (Ex. 23 at 46:19-21, 133:3-134:10). Oldani had no contact with Greg Elking, no contact with William Mock, and no investigative role in the Boyd homicide investigation. (Ex. 23 at 131:23-133:6). Oldani testified that he "only knew what [he] knew by reading the reports" and did not meet with detectives or sergeants about individual cases. (Ex. 23 at 62:24-63:1). Oldani did not approve Nickerson's principal narrative report. (Ex. 23 at 112:23-114:11). Oldani testified that the ultimate decision-maker for prosecution decisions was the "Circuit Attorney's office" and not the police department. (Ex. 23 at 141:20-23). Plaintiff admitted at his deposition that he did not recall any interactions with Oldani during the investigation. (Ex. 14 at 183:8-10).

Sergeant Burgoon signed Nickerson's warrant application. However, ACA Warren testified he understood Elking made an identification without suggestion from Nickerson; before authorizing charges, Warren met with Elking and Elking did not indicate he was influenced. (Ex. 13 at 138:3-139:2; 265:20-266:11). Burgoon testified that he "dropped the ball" on the alibi issue reflects his assessment of his own oversight. (Deposition Transcript of Joseph Burgoon, Vol. I, Ex. 68, at 206:17-212:6). Burgoon testified that he had no prior history of concerns

about Nickerson fabricating evidence. (Ex. 68 at 250:25-251:4). Burgoon was not present at the lineup, was not present for the Mock interview, and did not testify to having knowledge that Elking's identification was coerced or that information was being fed to Mock. (See Ex. 21; Ex. 30, Ex. 69). Stittum, Bailey, and Burgoon all testified that they trusted Nickerson and had no reason to believe he would fabricate evidence. (Ex. 7 at 159:25-161:1; Ex. 68 at 250:25-251:4; Ex. 20 at 124:1-18).

When asked at his deposition for the basis of his allegation that officers conspired to frame him, Plaintiff answered: "I don't know, ma'am. I think that's what this discovery process is about; right?" (Ex. 14 at 173:11-12).

At his April 2026 deposition in this case, Plaintiff acknowledged that he had been housed in the holdover with Campbell. (Deposition Transcript of Lamar Johnson, Vol. II, Ex. 69, at 63:3-5). Plaintiff wrote in an August 6, 2002 letter that Detective Campbell "probably did say" ask him why he let the white guy live. He testified at his deposition: "I relayed to [Phillip Campbell] what I knew about the case." (Ex. 69 at 63:3-5).

At her February 2026 deposition, Leslie Williams testified that she told the truth at Plaintiff's criminal trial. (2026 Deposition Transcript of Leslie Williams, Ex. 70, at 94:10-17). She testified that Plaintiff was the only person Boyd was having problems with at the time, and that she believed Plaintiff was responsible

for Boyd's death. (Id. at 17:8-11, 25:14-19, 49:1-17; 66:14-23). In her 1995 pretrial deposition, Williams testified that Plaintiff and Boyd had a falling-out and that "the only person that seemed like they had any animosity towards him was Lamar." She also testified that Boyd had previously said, when news of other South Side murders came on, that "Lamar had something to do with that." (1995 Deposition Transcript of Leslie Williams, as Ex. 71, at 5-6; 12-13). In her 2026 deposition, Williams testified that the only person she could see who had a problem with Boyd was Plaintiff, and that Boyd had told her "Lamar did that" in reference to other neighborhood homicides. (Ex. 70 at 49; 63-64). Tondaleria Boyd has not recanted the statement she gave to police. Williams also said she was telling the truth when she testified "I don't know who did it." Ex. 68 Williams also testified that "it's just a feeling… a feeling can be wrong" regarding who shot Boyd. Ex. 68 At her deposition, Pam Williams testified that on the night of the shooting, "[Leslie] called me … she told me that Markus had got shot and believed Lamar did it." (Deposition Transcript of Pamela Williams, Ex. 72, at 124:1-8).

At his 2026 deposition, Plaintiff confirmed that he was a member of the "Dark Side" group—a neighborhood engaged in drug trafficking—alongside Stanford Morris, Lamont McClain, and James Howard, all of whom were also selling narcotics. (Ex. 14 at 145-46).

Johnson testified at his deposition that on August 1, 1994—three months before Boyd's murder—he was in a vehicle with Phillip Campbell when they encountered police, and Campbell pulled a loaded .28 Taurus special from his pants and hid it under the seat before fleeing on foot. (Ex. 14 at 209:4-210:20). Plaintiff testified that he was attempting to purchase a rifle in October 1994—the same month Boyd was murdered—and that he asked Boyd to buy bullets for him because Plaintiff lacked a valid identification card. (Ex. 14 at 244:13-22, 247:3-248:10).

At his May 2026 deposition, Johnson confirmed that he was arrested with Phillip Campbell in relation to the homicide of Paul Kneely and Marvel Reid. (Ex. 69 at 27:4-12).

Johnson testified at his deposition that he witnessed Antonio Peterson commit a separate murder and filed an affidavit on Peterson's behalf in a habeas proceeding. (Ex. 14 at 69-73). When confronted with Peterson's own sworn affidavit stating that "Lamar Johnson is now in prison with me for committing a similar offense he committed I was sent to prison for, the shooting at Thurman and Blaine," Johnson did not deny it. (*Id*. at 88-90). Plaintiff testified that he filed a false affidavit under penalty of perjury in the Peterson case, stating that he "put together a false affidavit" because he "was being pressured and threatened by

Peterson to do that." (Ex. 14 at 83:2-10). Plaintiff testified that at the time, perjuring himself was his "least concern[]" and that his "concern was trying to survive." (Ex. 14 at 85:6-9).

At his April 2026 deposition, Johnson testified that he drafted the 1996 Phillip Campbell affidavit, stating: "I used Phillip's letters to draft that affidavit." (Ex. 14 at 137:15-23).

Plaintiff testified that he drafted Elking's 2003 affidavit—a 29-paragraph document containing specific allegations and direct quotations attributed to Detective Nickerson—based on Elking's letters. When asked whether he drafted the Elking affidavit, Plaintiff testified: "Yes, ma'am." (Ex. 14 at 110:3-11, 114:13-15). He testified that the affidavit included quotations and factual allegations that Elking had not independently provided, and that he did not know if he was the first person to raise the issue of the "lazy eye" in his correspondence with Elking. (Ex. 14 at 114). Plaintiff testified that the paragraph of the affidavit alleging that "Dwight Warren promised that if I cooperated, they would help my wife and I with money and to relocate through the witness protection program" was drafted by Johnson and included in the affidavit for Elking to sign. (Ex. 14 at 114:22-115:15).

Plaintiff testified that he "was involved in the preparation" of Howard's first two affidavits. (Ex. 14 at 149:14-50:4). Plaintiff testified that he sent the affidavits to Howard through an intermediary, Stanford Morris, and that he "looked at the

letters and affidavits that Phillip had provided, and ... just used that as a basis in drawing up the affidavit" for Howard. (Ex. 14 at 149:6-13). At the 2022 hearing before Judge Mason, James Howard testified that he did not personally write the first two affidavits. (Ex. 66 at 183-84).

Defendants' expert, Joseph Gamble, opined that the Boyd homicide investigation followed standard police procedures in 1994. (Expert Report of Joseph Gamble, Ex. 73, at 19-20).

In response to Interrogatory No. 15, Plaintiff alleged that Defendants Nickerson, Bailey, Stittum, and Jackson used suggestive and coercive tactics during the November 3, 1994 photo identification and lineup procedures administered with witness Greg Elking, suppressed Elking's repeated statements that he could not identify the assailants, and fabricated or conspired to conceal police reports concerning those procedures. Plaintiff also alleged that Defendants Nickerson, Jackson, and Crawford fabricated statements attributed to various witnesses, including Leslie Williams, Tondaleria Boyd, Dawn Byrd, Kristine Herrman, Ed Neiger, and William Mock, and that Defendants Jackson and Crawford fed information to jailhouse informant Mock and pressured him in exchange for leniency to produce fabricated documentary and audio-recorded statements. Plaintiff further alleged that Defendant Campbell conspired with

Nickerson to create a false report of incriminating statements attributed to Plaintiff. With respect to the supervisory Defendants, Plaintiff alleged that Defendants Burgoon, Oldani, and Henderson conducted reckless investigations by failing to ensure compliance with department policies—including the investigation of Plaintiff's alibi—and by failing to identify red flags in Defendant Nickerson's police work. (Pl.'s Suppl. Resp. to Def. Nickerson's First Set of Interrogatories, Ex. 74, at 29-38).

In response to Interrogatory No. 16, Plaintiff identified seven categories of allegedly fabricated evidence: (1) police reports misrepresenting and fabricating the circumstances of interactions with Greg Elking, including the photo identification and lineup procedures; (2) reports fabricating witness statements from Dawn Byrd, Kristine Herrman, Leslie Williams, and Ed Neiger concerning Plaintiff's purported motive; (3) reports fabricating statements attributed to Leslie Williams, Pamela Williams, and Tondaleria Boyd regarding Plaintiff's alleged involvement in other crimes; (4) the false report of Plaintiff's purported admission to Detective Campbell; (5) fabricated documentary and audio-recorded statements attributed to William Mock; (6) reports misrepresenting police interactions with Phillip Campbell and Plaintiff on November 6, 1994; and (7) fabricated reports concerning Defendant Nickerson's purported efforts to disprove Plaintiff's alibi. (Ex. 74 at 38-46). In response to Interrogatory No. 17, Plaintiff alleges that officers

suppressed their alleged lack of probable cause, knowledge of Elking's state of mind, knowledge of Mock's unreliability, knowledge of other officers' actions, knowledge of Elking's payments, knowledge that statements were fabricated, and Nickerson's knowledge of the alibi. (Ex. 74 at 46-49).

At her deposition, when reviewing her recantation affidavit, Dawn Byrd testified that she signed the affidavit without carefully reviewing it, and that portions of the affidavit were false. (Deposition Transcript of Dawn Byrd, as Ex. 75, at 173:6-18).

**Summary Judgment Standard**

Summary judgment is proper if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a). The movant bears the initial responsibility of informing the Court of the basis for the motion and must identify those portions of the record which the movant believes demonstrate the absence of a genuine issue of material fact. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial. *Id*.

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, a movant is entitled to summary judgment if the movant shows that "there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." In this context, a fact is material if it "might affect the outcome of the suit under the governing law," and a dispute is genuine if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In applying this standard, the Court must view the evidence in the light most favorable to the nonmoving party, giving that party the benefit of all inferences that may be reasonably drawn from the evidence. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986); *Recio v. Creighton Univ.*, 521 F.3d 934, 938 (8th Cir. 2008). Thus, the relevant inquiry is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the evidence are functions for the trier of fact, not those of a judge on a motion for summary judgment. *Torgerson*, 643 F.3d at 1042 But the nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts. *Id*. In order to show that disputed facts are material, the party opposing summary judgment must cite to the relevant substantive law in identifying facts that might affect the outcome of the suit. *Quinn v. St. Louis Cnty.*, 653 F.3d 745, 751 (8th Cir. 2011). The mere existence of a scintilla of evidence in

support of the nonmovant's position will be insufficient; there must be evidence on which the trier of fact could conceivably find for the nonmovant. See *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 791-92 (8th Cir. 2011). Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Torgerson*, 643 F.3d at 1042.

**Discussion**

**Individual Defendants**

The Court agrees with the Individual Defendants that they are not required to present the facts in the light most favorable to Plaintiff. The summary judgment standard under Rule 56 of the Federal Rules of Civil Procedure require the Court, not the moving party, to construe the facts in the light most favorable to the nonmoving party.

Further, the Court agrees with Individual Defendants that Plaintiff has conceded Count IV must be dismissed. Likewise, Plaintiff admits his *Brady v. Maryland,* 373 U.S. 83 (1963) claim cannot be based on what happened during his own interrogation. As such, any *Brady* claim which relies on Plaintiff's own interrogation is dismissed.

With respect to Plaintiff's May 2026 supplemental interrogatory theories, because Plaintiff did not address these theories in response to the Individual

Defendants' motion and argument, the Court agrees with Defendants that Plaintiff has waived any objection to their arguments in this regard.

**Qualified Immunity**

The United States Supreme Court very recently addressed qualified immunity.

> Government officials enjoy qualified immunity from suit under § 1983 unless their conduct violates clearly established law. *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5, 142 S.Ct. 4, 211 L.Ed.2d 164 (2021) (per curiam). "A right is clearly established when it is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.' " [*Amnesty America v. West Hartford*, 361 F.3d 113 (2004)]. A right is not clearly established if existing precedent does not place the constitutional question " 'beyond debate.' " [*Amnesty America*].
>
> To find that a right is clearly established, courts generally "need to identify a case where an officer acting under similar circumstances ... was held to have violated" the Constitution. *Escondido v. Emmons*, 586 U.S. 38, 43, 139 S.Ct. 500, 202 L.Ed.2d 455 (2019) (per curiam) (internal quotation marks omitted). The relevant precedent must define the right with a "high degree of specificity," so that "every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *District of Columbia v. Wesby*, 583 U.S. 48, 63, 138 S.Ct. 577, 199 L.Ed.2d 453 (2018) (internal quotation marks omitted). Principles stated generally, such as that "an officer may not use unreasonable and excessive force," do not suffice. *Kisela v. Hughes*, 584 U.S. 100, 105, 138 S.Ct. 1148, 200 L.Ed.2d 449 (2018) (per curiam). In short, officers receive qualified immunity unless they could have "read" the relevant precedent beforehand and "know[ n]" that it proscribed their specific conduct. *City and County of San Francisco v. Sheehan*, 575 U.S. 600, 616, 135 S.Ct. 1765, 191 L.Ed.2d 856 (2015).

*Zorn v. Linton*, __ US __, 146 S. Ct. 926, 930 (2026).

**Defendant Nickerson**

Plaintiff asserts numerous claims Defendant Nickerson fabricated evidence against him in order to close the murder investigation of Marcus Boyd. For example,[1] failing to advise ACA Warren of several facts involving Greg Elking; Defendant's failure to time the length of time it took to drive from Plaintiff's girlfriend's house to the murder scene and failing to advise ACA Warren that he did not do so; telling Elking what positions Plaintiff and Phillip Campbell were in the line ups.

> To support a claim that a state actor manufactured or fabricated false evidence, a plaintiff must show a state actor deliberately, or at least recklessly, coerced a witness to make a false statement to frame a criminal defendant. See *Riddle v. Riepe*, 866 F.3d 943, 947 (8th Cir. 2017); cf. *Williams v. City of Alexander*, 772 F.3d 1307, 1311 (8th Cir. 2014); Walz, 2 F.4th at 1104; *Clark v. City of St. Louis*, No. 4:21-cv-788, 2026 WL 412282, at *3 (E.D. Mo. Feb. 13, 2026) (plaintiff can establish Fourth Amendment violation by showing a state actor intentionally or recklessly included false statements in a warrant affidavit). A plaintiff must point to some misconduct by a state actor to survive summary judgment. See Livers, 700 F.3d at 351-52 (reckless or intentional conduct necessary to establish constitutional violation); Kingdom Holdings, LLC v. Foss, No. 5:23-cv-5060, 2024 WL 4266755, at *6 (D.S.D. Sept. 23, 2024) (collecting cases).

*Jones v. Gettman*, No. 8:23-CV-182, 2026 WL 1972272, at *4 (D. Neb. July 8, 2026).[2]

---

[1] The Court's examples here and throughout this Opinion are intended for exemplary purposes only and in no way indicate the Court is limiting the facts to only the examples set out.

[2] Judge Gerranrd noted in footnote 2: It's unclear whether those constitutional rights arise under the Fourth or the Fourteenth Amendment. While the Eighth Circuit appears to recognize that an alleged reckless investigation implicates a person's Fourteenth Amendment substantive due process rights, see Walz, 2 F.4th at 1104,

> It was clearly established by 2006 that the Fourteenth Amendment's guarantee of due process is violated by "the manufacture of ... false evidence" in order "to falsely formulate a pretense of probable cause." *Moran I*, 296 F.3d at 647; see *Moran v. Clarke*, 359 F.3d 1058, 1060–61 (8th Cir.2004) (Moran II ); see also Wilson, 260 F.3d at 957. Livers and Sampson contend all appellants conspired with each other and with Commander Kofoed to fabricate evidence against them, in violation of their Fourteenth Amendment rights to due process. Livers and Sampson both specifically allege (1) Commander Kofoed "planted Wayne Stock's blood on a swab purportedly taken from" Will's car; (2) Investigators Lambert and Schenck coerced Reid into falsely implicating Livers and Sampson; and (3) Investigator O'Callaghan and Sergeant Weyers attempted to coerce Paulding into falsely saying Livers admitted to murdering the Stocks. Livers also contends Investigators Lambert and Schenck coerced Fester into implicating Livers. The district court found, without further elaboration, "there was a showing that evidence was fabricated" against Livers and Sampson and "[t]he extent of [the Cass appellants' and NSP appellants'] knowledge of, or complicity in, that act is a question of fact for the jury." In a qualified immunity interlocutory appeal, this finding is enough.

*Livers v. Schenck*, 700 F.3d 340, 354–55 (8th Cir. 2012)

It is elementary that a police officer's use of false evidence to secure a conviction violates a defendant's substantive due process rights. *White v. Smith*,

---

the Eighth Circuit has also unequivocally held that the Supreme Court in Manuel abrogated its due process jurisprudence because "any deprivation" of a person's " 'liberty before his criminal trial [including arrest without probable cause] ... is governed by the Fourth Amendment and its prohibition on unreasonable seizures[,]' not the Fourteenth Amendment." Stockley v. Joyce, 963 F.3d 809, 821 (8th Cir. 2020) (quoting Johnson, 942 F.3d at 410-11) (alterations in original). The cases relied upon in Walz predate the purported abrogation, yet the panel recognized a "constitutionally protected interest in 'obtaining fair criminal proceedings before being denied one's liberty[.]' " See 2 F.4th at 1104 (quoting Wilson v. Lawrence Cnty., 260 F.3d 946, 956 n.8 (8th Cir. 2001)).

Jones, No. 8:23-CV-182, 2026 WL 1972272, at *4 (D. Neb. July 8, 2026)

696 F.3d 740, 754 (8th Cir.2012) (citing *Wilson v. Lawrence County*, 260 F.3d 946, 954 (8th Cir.2001), and Napue v. Illinois, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959)). The Eighth Circuit has "recognized that a plaintiff can make out a violation of substantive due process by 'offer[ing] evidence of a purposeful police conspiracy to manufacture, and the manufacture of, false evidence.' " *White*, 696 F.3d at 754 (quoting *Moran v. Clarke*, 296 F.3d 638, 647 (8th Cir.2002) (en banc)).

Defendant argues that the police report was never entered into evidence. This argument misses the point. Plaintiff contends that in giving the information contained in the police report to ACA Warren, ACA Warren brought the charges against Plaintiff based on fabricated evidence.

Based on the totality of the circumstances and construing the facts in the light most favorable to Plaintiff, the bar against fabricating evidence and withholding information from ACA Warren was clearly and specifically established Defendant Nickerson is not entitled to qualified immunity on Plaintiff's Count I.

**Defendant Ralph Campbell**

Plaintiff also argues Defendant Ralph Campbell's report that Plaintiff blurted that he "shouldn't have let the white guy live" was false. As discussed above, fabrication of evidence is a violation of Plaintiff's clearly established rights.

Although Defendant attempts to establish Plaintiff "admitted" he said he shouldn't have let the white guy live, Plaintiff did not admit he said this, rather, he admitted Campbell probably did ask him the question, which is quite the opposite of Plaintiff volunteering the information.

While Defendants throughout their motion for summary judgment argue Plaintiff is lying and his testimony, as well as the recantation of Elking should not be believed, the credibility of all actors should be determined by the trier of fact and not the Court in a summary judgment analysis. Defendant Campbell is not entitled to qualified immunity on Count I.

**Defendants Bailey, Stittum, Jackson, Crawford, Oldani, Burgoon, and Henderson**

Plaintiff cannot rely on the actions of Nickerson to assert a deprivation of rights claim against other defendants.

> A person "may be held personally liable for a constitutional violation only if his own conduct violated a clearly established constitutional right." *Baribeau v. City of Minneapolis*, 596 F.3d 465, 482 (8th Cir. 2010). Qualified immunity thus requires an individualized analysis as to each officer. *Roberts v. City of Omaha*, 723 F.3d 966, 974 & n. 2 (8th Cir. 2013). While an exhaustive written analysis of the claims against each defendant is not required, the district court must analyze "each officer's alleged conduct to determine whether the factual allegations against each individual officer were sufficient to overcome qualified immunity." *Id.* at 974. The analysis must set forth findings of fact and conclusions of law "sufficient to permit meaningful appellate review." *Walton v. Dawson*, 752 F.3d 1109, 1116 (8th Cir. 2014).

> In *Roberts*, "the district court *did not conduct* an individualized analysis of each officer's alleged conduct" in denying defendant officers qualified immunity from the plaintiff's Fourth Amendment excessive force claims. 723 F.3d at 974 (emphasis added).
>
> We therefore held the qualified immunity analysis inadequate, conducted our own individualized analyses using the district court's evidence-based factual findings, and reversed the denial of qualified immunity for many but not all the defendants. *Id.* at 974–75. Here, the district court's order provided some brief background about most of the uses of force alleged but failed to mention one use of force and cursorily stated that the evidence was sufficient as to those "particular instances" of force, referring to all the detainees, officers, and uses of force collectively. While each use of force involved an officer using mace against a detainee, each incident was independent and involved unique circumstances, including the specific ***646** officers and detainees, the surrounding events, and the detainee conduct that prompted the use of mace. In these circumstances, the district court failed to perform a proper individualized qualified immunity analysis. *See id.*

*Jones v. City of St. Louis, Missouri*, 183 F.4th 638, 645–46 (8th Cir. 2026).

Plaintiff fails to present evidence that these defendants knew of and actually participated in the claimed fabricated evidence. Each of these defendants have presented uncontroverted evidence they had little to do with the murder investigation and were unaware of anything amiss. Plaintiff's inability to present evidence these defendants individually participated in a conscious violation of Plaintiff's rights forecloses Plaintiff's claims against them. Defendants Bailey, Stittum, Jackson, Crawford, Oldani, Burgoon, and Henderson are entitled to qualified immunity on Count I.

**Malicious Prosecution**

The defendants assert they are entitled to judgment as a matter of law on Plaintiff's claim for malicious prosecution fails because there existed probable cause supporting the state prosecution.

A malicious prosecution claim requires three elements: (1) the suit must have been instituted without probable cause; (2) the motive in instituting the suit was malicious; and (3) the prosecution terminated in the acquittal or discharge of the accused. *Thompson v. Clark*, 596 U.S. 36, 44 (2022). A defendant is liable for malicious prosecution to the extent that defendant's actions "caused the initiation of criminal proceedings despite having no good reason to believe that criminal charges were justified by the facts and the law." *Id.* (internal quotations omitted); see also *Pitt v. Dist. Of Columbia*, 491 F.3d 494, 511 (D.C. Cir. 2007) ("malicious prosecution is actionable under [§ 1983] to the extent that the defendant's actions cause the plaintiff to be unreasonably 'seized' without probable cause, in violation of the Fourth Amendment").

In Missouri the elements of a malicious prosecution claim are: (1) commencement of an earlier suit against the party; (2) instigation of that suit by the adverse party; (3) termination of the suit in the party's favor; (4) lack of probable cause for filing the suit; (5) malice by the adverse party in initiating the suit; and (6) damage sustained by the party as a result of the suit. *State ex rel Patrick O'Basuyi v. Vincent,* 434 S.W.3d 517, 519 (Mo.2014); *Ulrich Med. USA, Inc. v.*

*Dickman*, No. 4:15 CV 686 RWS, 2015 WL 5886109, at *2 (E.D. Mo. Oct. 8, 2015).

Under Missouri law, the test for determining whether probable cause existed asks "whether the facts and circumstances would warrant a belief in an ordinarily cautious person that another had committed a crime." *Zike v. Advance Am., Cash Advance Ctrs. of Mo., Inc.*, 646 F.3d 504, 509 (8th Cir. 2011) (citation omitted). "It is enough for the officer to show...'merely arguable probable cause,' which is a mistaken, but objectively reasonable belief, that the suspect committed a criminal offense." *Copeland v. Wicks*, 468 S.W.3d 886, 891 (Mo. 2015) (quoting *Dowell v. Lincoln Cty., Mo.*, 762 F.3d 770, 777 (8th Cir. 2014)).

Defendants argue there was sufficient probable cause based on the interview of Leslie Williams, Elking's identification of Plaintiff from a photo array, Plaintiff and Campbell were apprehended together in Plaintiff's car, dark blue sweat pants and a black nylon jacket matching eyewitness descriptions were recovered from the vehicle, a black ski mask similar to the one used in the murder had previously been recovered from Plaintiff's vehicle, Mock's jailhouse statement, and Johnson's own inculpatory statement to Detective Campbell. Most of these facts, however, are in dispute and must be resolved by a jury.

Although ACA Warren testified he approved the charges and wrote the warrant application, he believed what he was told by Detective Nickerson to

determine there was probable cause to issue the warrant. Because Plaintiff disputes the validity of the basis for ACA Warren's determination, probable cause cannot be found.

Additionally, the Eighth Circuit has held a person's constitutional rights are violated if a state actor intentionally or recklessly manufactures false evidence by coercing a witness to falsely implicate someone in a crime. *See Livers* 700 F.3d at 354-55(citing *Moran v. Clarke*, 296 F.3d 638, 647 (8th Cir. 2002) (*en banc*)), *abrogated by Manuel v. City of Joliet*, 580 U.S. 357 (2017) as recognized in *Johnson v. McCarver*, 942 F.3d 405, 410-11 (8th Cir. 2019)) (using "reckless investigation" due process standard where law enforcement allegedly coerced witness); cf. *Carnes v. Blehm*, No. 25-1490 (8th Cir. July 7, 2026) (slip op.) (citing *Walz v. Randall*, 2 F.4th 1091, 1104 (8th Cir. 2021)) (discussing "constitutionally inadequate investigation" under "reckless investigation" standard).

**Civil Conspiracy**

As the Individual Defendants correctly argue,

> To prove a § 1983 conspiracy claim, McKay must demonstrate that the defendants "(1) conspired with others to deprive him ... of a constitutional right; (2) at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; and (3) the overt act injured" him. *See Helmig*, 828 F.3d at 763. McKay "is additionally required to prove a deprivation of a constitutional right or privilege in order to prevail on a § 1983 civil conspiracy claim." *See White v. McKinley*, 519 F.3d 806, 814 (8th Cir. 2008).

*McKay v. City of St. Louis*, 960 F.3d 1094, 1102 (8th Cir. 2020).

The fact that the Individual Defendants participated in the murder investigation does not rise to the level of a meeting of the minds to deprive Plaintiff of his constitutional rights. Outside of the investigative nature of their actions, there is no evidence of "'concerted activity toward unlawful objective.' *Myers v. Morris*, 810 F.2d 1437, 1454 (8th Cir.1987), *abrogated on other grounds*, *Burns v. Reed*, 500 U.S. 478, 483–84 n. 2, 496, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991)." *Livers* 700 F.3d at 362. The Individual Defendants are entitled to judgment as to Plaintiff's Civil Conspiracy in Counts III.

***Brady Claims***

The remaining Individual Defendants, Nickerson and Campbell, argue the financial payments to Elking were disclosed, not under the purview of the Individual Defendants, and are not actionable under *Brady*.

> While *Brady* requires the [g]overnment to tender to the defense all exculpatory evidence in its possession, it establishes no obligation on the Government to seek out such evidence. *United States v. Riley*, 657 F.2d 1377, 1386 (8th Cir. 1981) (quoting *United States v. Walker*, 559 F.2d 365, 373 (5th Cir. 1977)); *see also United States v. Hall*, 171 F.3d 1133, 1145 (8th Cir. 1999) ("[T]he government has no obligation to obtain for a defendant records that it does not already have in its possession or control."). "*Brady* requires the prosecution to disclose to the defendant only evidence in the prosecution's possession." *United States v. Jones*, 34 F.3d 596, 599 (8th Cir. 1994). Similarly, Rule 16 requires the government to disclose evidence "within the government's ***1157** possession, custody, or control." Fed. R. Crim. P. 16(a)(1)(B)(i), (E).
>
> "When information is readily available to the defendant, it is not *Brady* material, and the prosecution does not violate *Brady* by not discovering and

> disclosing the information." *Jones*, 34 F.3d at 600. And "the government need not disclose evidence available to the defense from other sources or evidence already possessed by the defendants." *United States v. Gonzales*, 90 F.3d 1363, 1368 (8th Cir. 1996). Nor is there a "*Brady* violation if the defendant[ ], using reasonable diligence, could have obtained the information [himself]." *United States v. Jones*, 160 F.3d 473, 479 (8th Cir. 1998) (citation modified).
>
> Thus, "the government does not suppress evidence in violation of *Brady* by failing to disclose evidence to which the defendant had access through other channels." *Adkins*, 161 F.4th at 1134 (citation modified).

*United States v. Crump*, 179 F.4th 1137, 1156–57 (8th Cir. 2026).

**Financial Assistance**

Defendants claim there is no evidence that they had knowledge of or participation in receiving financial assistance. Construing the facts in the light most favorable to Plaintiff however, the record establishes that Elking testified that Nickerson promised him money, that Nickerson escorted Elking to receive his first payment and that Elking's wife worked with Detective Nickerson. There is sufficient evidence in the record to present this issue to a jury regarding Defendant Nickerson's knowledge and failure to disclose the information to Plaintiff and to ACA Warren, both of whom deny knowledge of the payments.

Plaintiff, however, has presented no evidence that Defendant Campbell had any involvement in any of the payments made to Elking, and as such, he is entitled to summary judgment on this claim.

Defendant Nickerson's argument that defense counsel and the ACA had access through other means also remains in dispute. Whether Elking was promised payments for matters other than relocation is in dispute. Defense counsel was unaware that the payments were for items other than relocation.

**Mock's Mental Health Records**

Plaintiff argues Mock's mental health records were readily available to Defendants, since the St. Louis police had arrested him several times for crimes that demonstrated obvious mental health concerns, that Nickerson had a phone call with Mock's probation officer, and that Nickerson admits he would have asked a thousand questions to get information on Mock. This argument is speculative and fails to present credible evidence that anything was known by Nickerson regarding Mock that was not disclosed to Plaintiff.

**Timing of Drive**

With respect to Plaintiff's argument regarding Defendant Nickerson's claim he was able to drive from Plaintiff's girlfriend's house to the location of the murder, Plaintiff fails to overcome Defendant Nickerson's argument that Plaintiff had all of the means to time the drive himself; there was nothing for Nickerson to suppress since the information was available through other means.

**City of St. Louis Motion for Summary Judgment**

Defendant City of St. Louis moves for summary judgment on Count VIII. Count VIII is brought pursuant to *Monell v. New York City Dept. of Social Servs*., 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611.

Plaintiff claims City of St. Louis was responsible for the administrative policies, practices, and functions of the St. Louis Circuit Attorney's Office and that the St. Louis Circuit Attorney's Office maintained records of payments made to witnesses in criminal prosecutions through the Office of Victim Services.

Plaintiff alleges that the payments made to witnesses are frequently exculpatory and/or impeachment evidence constitutionally required to be disclosed in criminal prosecutions, however, the St. Louis Circuit Attorney's Office's policy for maintaining these records kept them segregated from employees responsible for producing documents to criminal defendants, including individual prosecutors and employees responding to records requests.

Plaintiff further alleges that the Board of Police Commissioners was responsible for issuing checks made out through the Office of Victim Services, and thus must have maintained records of these payments, but that the Board of Police Commissioners also kept any records of these payments segregated from employees responsible for producing documents to criminal defendants, and employees responding to records requests.

Plaintiff asserts that as a result of these policies, documents substantiating payments made to prosecution witnesses were routinely not disclosed to criminal defendants and accordingly caused *Brady* violations.

Defendant City of St. Louis presented unequivocal evidence that the City does not have authority or responsibility over the Circuit Attorney's Office.

> The Circuit Attorney of the City of St. Louis is a separately elected office governed by state law. Edward Roth, the City's corporate designee, so testified. The circuit attorney of the city of St. Louis shall manage and conduct all criminal cases, business and proceedings of which the circuit court of the city of St. Louis shall have jurisdiction. He shall appear for the state in all misdemeanor cases appealed from the circuit court of the city of St. Louis to the court of appeals.

Mo. Rev. Stat. § 56.450.

Likewise, Mr. Roth testified that the Board of Police Commissioners "was a state agency, not part of the city of St. Louis" during the period of 1983 through 1999, and that the City was not a party to the agreement between the Board of Police Commissioners and the Circuit Attorney's Office regarding witness relocation.

Indeed, Mr. Roth confirmed that the funding that Plaintiff presents as payments to Elking and his family were not city administered funds. No City agency played any role in the expenditures. The funds were from asset forfeiture funds in the hands of the Board of Police Commissioners.

Plaintiff fails to prevent any evidence to controvert Mr. Roth's sworn deposition testimony. Accordingly, Plaintiff has failed to come forward with any evidence to establish the existence of disputed material facts. The City of St, Louis is entitled to judgment as a matter of law.

**Conclusion**

Based upon the foregoing analysis, Defendants Clyde Bailey, Ronald Jackson, Gary Stittum, Jeffrey Crawford, Robert Oldani, Joseph Burgoon, and Timothy M. Weaks as Personal Representative of the Estate of Ronald Henderson's are entitled to qualified immunity and therefore entitled to summary judgment. Plaintiff's Failure to Intervene and Civil Conspiracy claims are dismissed, as well as Plaintiff's *Brady* claim based on his own interrogation.

The City of St. Louis' Motion for Summary Judgment is well taken and is granted.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants Joseph Nickerson, Clyde Bailey, Ronald Jackson, Gary Stittum, Jeffrey Crawford, Robert Oldani, Joseph Burgoon, Christina Ross as Special Administrator of the Estate of Ralph Campbell, and Timothy M. Weaks as Personal Representative of the Estate of Ronald Henderson (collectively "Individual Defendants"), Motion for Summary Judgment, [Doc. No. 179], is granted in part and denied in part

**IT IS FURTHER ORDERED** that the City of St. Louis' Motion for Summary Judgment, [Doc. No. 180] is granted.

**IT IS FURTHER ORDERED** that judgment will be entered at the time of Resolution of the remaining claims.

Dated this 2nd day of September, 2026.

HENRY EDWARD AUTREY
UNITED STATES DISTRICT JUDGE